Camden, &c.
Company
v.
Burke.

THE CAMDEN AND AMBOY RAIL ROAD AND TRANSPOR-
TATION COMPANY *vs.* BURKE.

A company, using steam-boats and rail-roads for the transportation of *passengers* and their *baggage*, are liable as *common carriers* for damages happening to the *baggage* of passengers from a defect in the vehicles or machinery used, although the company is not chargeable with *actual negligence* or *want of skill*, or *want of care*, in securing the safety of the baggage; if injury happens to it, nothing will excuse the company but *inevitable accident* arising from superhuman causes, or the *acts of the enemies of the country*.

The same rule does not apply, if injury happens to the *persons* of the passengers. In such cases, if the company have done all that human foresight and care can do to insure the safety of the passengers, they are not liable to respond in damages.

*Notice* in the usual form, " All baggage at the risk of the owners," though brought home to the knowledge of the passengers, will not in such case excuse the company. *Common carriers* cannot, by such notice, excuse themselves from the *implied agreement* that the vessel, coach or other vehicle, used for the transportation of goods or baggage, is sufficient for the business in which it is employed.

ERROR from the superior court of the city of New-York. Burke brought his action against the company, the proprietors of a line of steam-boats and of a rail-road and carriages between New-York and Philadelphia, for damage done to the wardrobe, music and musical instruments of his *minor* son, master Burke, a stage player, by the wardrobe, &c. falling into the water at *Bordentown*, whilst the agents of the company were in the act of passing the baggage from a steam-boat of the company to the cars upon the rail-road. Master Burke was a passenger, in the line of the company, from Philadelphia to New-York, in December, 1833, and had with him a number of trunks, containing his wardrobe, &c; he paid not only for his passage, but an extra sum for the transportation of his baggage. The mode of conducting the operations of the company is thus : After the boat is under way, the baggage of the passengers is placed in a crib, which, on the arrival of the boat at Bordentown, is removed from the steam-boat to the cars on the rail-road by means of a *crane*—a stationary fixture on the wharf. The fall from the crane is by a

rope attached to a pully with a large double and single block. The rope and block straps used at the time of the accident were four and half inches in circumference. In removing the baggage, the strap of one of the blocks gave way or broke, and the crib with the baggage fell into the water, by means of which the injury complained of was sustained. The crib alone weighs 510lbs., and the whole weight at the time of the accident was less than 3000lbs. A rope of the thickness of that employed at the time of the accident is capable of sustaining a weight of at least *three tons.* The captain of the steam-boat, who had been a sea-faring man for 14 years, *examined the rope immediately after the accident, and could not discover the cause of its giving way—there was no assignable cause for the accident.* The block had been strapped and been in use seven or eight months. The block strap broke short off; it was covered with spun yarn and leather where it broke. Another witness, a seaman and rigger, who fitted the blocks and strapped them, testified that the rope ought to have lasted upwards of a year. Since the accident, the company use a rope five and three-fourth inches in circumference. The agent of the company, whose business it was to superintend the wharf at Bordentown, testified that he examined the ropes daily, and that they were sound as far as the human eye could discover. When the rope broke, a defect could not have been discovered without taking off the spun yarn, which had not been done, nor had he examined particularly to see whether the rope had lengthened; it did not appear to him that it had. It was proved that there were *notices* affixed in different parts of the boat, on which were printed the words, "All baggage at the risk of the owner," which were seen by Master Burke. Forty pounds baggage were allowed to a passenger, as covered by his fare; for all over, an additional charge was made—the same sum being asked for 140 lbs. as for the fare of a passenger, and so in proportion. Master Burke paid $1,50, for his baggage. Several witnesses testified as to the extent of injury to the wardrobe, &c. Chief Justice Jones, of the superior court, charged the jury, that if the loss was to be ascribed to the *negligence* and *want of care* of the persons employed in the

carriage of the goods, the defendants, whose agents they were, must confessedly be held responsible for it in damages; but that, in the present case, those who are charged with the transportation of the goods *had been guilty of no culpable negligence or want of care*, and the evidence conclusively showed that the strap gave way, not from the improvident overcharge or unskilful or careless management of the crane and its machinery, but from some secret and unknown defect in the rope itself, not discoverable on inspection, nor discernible without examination of the interior of the rope composing the fall; and that therefore the liability of the defendants for the damages was purely a question of law, how far the defendants were responsible for the sufficiency of the vehicles employed in the transportation, and of the crane and its machinery, for the safe removal of the goods from the one to the other; and, in reference to that question, the chief justice charged the jury that if they were satisfied, from the evidence, that the loss or damage in the present case was occasioned by the inadequacy and defect of the machinery employed in the removal of the goods from the steam-boat to the rail-road car, *the defendants were answerable for it, notwithstanding that the defect in the strap to which it was owing, was unknown to the carriers, and not discoverable on inspection, and the loss may have happened without any culpable negligence or want of care of the carriers*, or their agents, in th application or management of the crane and its machinery, at the time. The judge further charged the jury, that the notification to the following purport, "All baggage at the risk of the owners," shown to have been published by the defendants in the boat, would not protect them from the loss, if attributable to the defect of the machinery. The counsel for the defendants excepted to this charge. The jury found a verdict for the plaintiff for $500, upon which judgment was entered. The defendants sued out a writ of error.

*J. Anthon*, for plaintiffs in error. It is apparent that, on the trial, the defendants were acquitted of all negligence, and that the judge laid down the rule of law that the *passenger carrier* is liable for all damage proceeding from his carriages or ma-

NEW YORK, May, 1835.

Camden &c. Company v. Burke.

chinery giving way accidentally, whether he had the power to guard against it or not; in other words, that he insures the perpetuity of the carriages against the operation of all natural causes, however latent the same may be, and how far soever beyond the reach of human foresight. The plaintiffs in error insist that this rule of law is unsound, and carries the liability of *passenger carriers* beyond the bounds of reason; that such carriers are bound to supply carriages and machinery sound and sufficient as far as the human eye and judgment can discover; and having done this, no more can be required of them; and if an accident occurs to the vehicle or machinery, after the exercise of such care and diligence, it is one against which human prudence cannot guard, and is consequently a casualty or *actus Dei*, for which the carriers are not responsible; and that such was clearly the case here, the judge not having thought fit to leave that as a question to the jury, but having, in the rule of law laid down by him, assumed it as fully proved. The true rule on this subject is correctly stated by Judge Story, and is abundantly supported by good sense and authority: "The passenger carrier binds himself to carry safely those whom he takes into his coach, *as far as human foresight and care will go;* that is, for the utmost care and diligence of very cautious persons. But passenger carriers, not being insurers, are not responsible for accidents when all reasonable skill and diligence has been employed; when every thing has been done that human prudence can suggest, accidents may happen," &c. *Story on Bailments* 379. This is clearly a rule conformable to the nature of human beings, and the subject matter on which they are to act, and may be practically applied without absurdity or injustice—and does not, as in the case before the court, make a carrier liable for that which he could by no means prevent. Judge Story is fully supported by the cases, as he is by the good sense and reason of the rule. Thus, in *Aimes* v. *Stevens*, 1 *Strange*, 128, in which there were goods on board a hoy, and in shooting a bridge the hoy struck and sunk, it was contended that she would not have sunk if she had been a better hoy. *Per Curiam:* No carrier is bound to have a new carriage for every journey; it is sufficient if he provide one

which, without any extraordinary accident, will probably perform the journey. In *Christian* v. *Grigg*, 2 *Campb.* 79. a passenger was injured by the breaking down of a stage. The axeltree snapped in going down some slight descent. The defendant proved that the axeltree had been examined a few days before it broke, without any flaw being discovered. Sir J. Mansfield: "If the axletree was sound as far as the human eye could discover, the defendant is not liable. There is a difference between a contract to carry goods and a contract to carry passengers. For the goods the carrier is answerable at all events, but he does not warrant the safety of passengers. His undertaking as to them goes no farther than this: that as far as human care and foresight can go, he will provide for the safe conveyance." If in such a case the passenger could not recover for a broken limb, *a fortiori* he could not recover for a table or any article of baggage injured from the same cause. In *Aston* v. *Havens*, 2 *Esp. N. P. C.* 533, the injury to the passengers proceeding from a casual overturn of the stage; but it led to a full exposition of the general rules of liability governing passenger carriers. Eyre, Ch. J.: "The action is founded entirely in negligence. Coach owners are not liable for injuries happening by accident or misfortune, when there has been no negligence of the driver." This case fully establishes, among other things, that before a liability for damage to the *person*, and *a fortiori* to the goods, from the vehicle or its management, can be incurred by the carrier, negligence must be established.

So, in the latest case which has occurred on this subject, *Sharp* v. *Grey*, 9 *Bing.* 457, the same rule is clearly laid down. This was similar to *Christian* v. *Grigg*, the accident having proceeded from breaking the axle. It differed however in this particular: that in the former case due care had been exhibited in examining the axle, and *in this the jury found a want of care.* The axle had a defect which must have been obvious to the builder of the carriage, and would have been discovered, if the wooden casing covering it, had been removed The want of care was exceedingly slight, it being proved that to take off the casing might be productive rather of insecurity than safety. Tindal, Ch. J.: "The judge, however,

left it to the jury to say, whether there had been, on the part of the defendant, that degree of vigilance which was required by his engagement to carry the plaintiff safely." It is very clear, from this statement, that if it had been conceded in this case, as it is in the one now under consideration, that there had been *no want of care and foresight*, the judge would have charged the jury directly for the defendant. This case was considered by the whole court, upon a motion for a new trial, and the verdict confirmed. Park, J. observed: "This was clearly a question of fact, and the damages are not excessive. It is clear there was a defect in the axle, and it was for the jury to say whether the accident was occasioned by what in law is called negligence in the defendant, or not." This case therefore, establishes fully the rule laid down by Judge Story, and also shows that the judge below erred in taking the question of negligence from the jury; and further, that if the jury had found that there was no want of care and caution, as the judge observes, that there ought to have been a verdict for the defendant. There are several *obiter dicta* of the judges in the case, on which the counsel for the defendant in error will rely, and which I shall presently briefly notice. They all, however, agree in the position taken by the chief justice at the trial, and expressed by Park, J., that it was clearly a question—"negligence or not, for the jury." Gaselee, J., says: "It was for the defendant to show there had been no defect in the construction of the coach; and whether there had, or not, was a question for the jury." This probably might require some qualification to make it conform to the other cases cited, viz. that it was for the defendant to show that whatever the defect may have been, the human eye could not detect it. Without this qualification, the dictum would not be sustainable; and the force of this qualification becomes very apparent, when that rule is applied to the case before the court. Here there was avowedly no defect in the original construction of the rope; by no process could the eye of the original maker or that of the carriers, detect the latent defect in the material used. It baffled solution, even after the accident happened. To apply the rule broadly to such a case would make the carrier liable at all events, whether he could or could not guard against the mischief; which would be unjust. The

same remarks will also apply to the *dicta* of Bosanquet, J., which require the same qualification to make them good law; and it is worthy of remark, that Alderson, J., who pronounces the last opinion delivered in the case, plainly perceiving that the dicta of his brethren, Gaselee and Bosanquet, required the qualification, contents himself with furnishing it, and with great accuracy. Alderson, J.: "A coach proprietor is liable for all defects in his vehicles which can be seen at the time of construction, as well as for such as may exist afterwards, and be discovered on investigation." All these cases result in the rule, that where all human caution and foresight has been used, and an accident happens, it is a *casus fortuitus*, for which the carrier is not responsible. *Colt* v. *M'Mechen*, 6 *Johns. R.* 160. It is true that the cases considered are cases of injury to the *person* of the passenger; but it cannot be that a different rule can exist, with regard to *baggage;* it would be exceedingly strange that a rule of law should deprive a passenger of damage for a broken leg, and yet give him damages for an injury to a chattel, of compaartively trivial importance, occuring at the same time. If the defendants discharge themselves from all negligence, their notice protects them against every thing else not necessarily embraced in the matters already discussed. It is not believed that any such distinction will be taken; but, if taken, it cannot bear serious discussion, and therefore will not at present be noticed.

*D. Graham, jun.* for defendant in error. It appears to be conceded on all hands, that the injury complained of by the plaintiff resulted from the intrinsic insufficiency of the machinery provided for the purpose of transporting baggage to and from the cars by the defendants below. The jury, it is true, have acquitted them of actual negligence in the management of the machinery; but in so doing they have only referred their liability to the question of law, on which they were instructed by the learned chief justice in the court below.

In commenting upon the principle laid down by the chief justice, as the governing one in this case, the counsel for the

NEW YORK, May, 1835. Camden, &c. Company v. Burke.

plaintiffs in error, at the very threshold, makes an assumption which is not warranted, either by the case or by the principles of law applicable to it. It is, that they are to be regarded as *passenger carriers*, as contradistinguished from *common carriers*, or carriers of goods.

The distinction between the rights and duties of *passenger* and *common* carriers, of which the learned counsel seems to have lost sight, is clearly laid down in the books. The obligation of the former, as expressed by the counsel himself, extends only "to carry safely those whom he takes into his coach, *as far as human foresight will go*, that is, to the utmost care and diligence of very cautious persons." *Story on Bailments*, 379. But if he be a *common* carrier, (or carrier of goods,) "he is in the nature of an issuer, and is answerable for accidents and thefts, and even for a loss by robbery. He is answerable for all losses which do not fall within the excepted cases of the act of God, or inevitable accident without the intervention of man, and public enemies." 2 *Kent's Comm. 2d ed.* 597. Nor has the hardship of this doctrine, although in some cases it has operated with almost unjust severity, ever introduced the courts to relax its rigor. They have uniformly regarded it as resting upon principles of public policy which it would be unwise, as well as unjust, to question or disturb. *Jones on Bailments*, 79, 85. *Story on Bailments*, 330. 338. 2 *Kent's Comm. 2d ed.* 602. *Riley* v. *Horn*, 5 *Bing*. 217. And however absurd it may seem, as the learned counsel supposes, that a greater degree of responsibility should exist, as it respects the protection of property, than in the case of personal safety, the soundness of the distinction between *passenger* and *common carriers* cannot be questioned. A principal reason for the greater extent of liability of common carriers is the impossibility of inanimate property taking care of itself; and its being necessarily exposed to numberless modes of loss or injury, beyond the care of the owner, as well as to prevent possible collusion or fraud, on the part of the carrier. None of these reasons can apply to the transportation of passengers, who, by the very laws of nature, are invested with attributes that would render the application to them of rules governing the transportation of inanimate property perfectly absurd, and

which, in a recent case, even where human beings were held as property, being slaves, induced the supreme court of the United States to hold, that the rigid rule of the common law, which governs the carriage of inanimate property, even in the case of common carriers, did not apply. *Boyce* v. *Anderson*, 2 *Peters*, 150. Even in one of the cases cited by the plaintiffs in error, *Christie* v. *Griggs*, 2 *Campb.* 79, this very distinction is admitted and enforced. "There is, says Sir James Mansfield, a difference between a contract to carry goods, and a contract to carry passengers. *For the goods the carrier is answerable at all events, but he does not warrant the safety of passengers; his undertaking, as to them, goes no further than this: that as far as human care and foresight can go, he will provide for their safe conveyance.*" Waiving, therefore, for a moment, the inquiry whether, upon the grounds assumed, the defendants below are not liable for a latent defect in their own machinery, although beyond the reach of ordinary foresight, I propose briefly to ask the attention of the court to the main position on which I rely, namely, that the defendants below are liable, as common carriers, for the loss sustained by the plaintiff.

Chancellor Kent defines common carriers thus: "Common carriers undertake generally, and for all people, indifferently, to convey goods, and deliver them at a place appointed for hire, and with or without a special agreement as to price." They consist of two distinct classes of men, viz. inland carriers by land or water, and carriers by sea, and in the aggregate body are included the owners of stage wagons, and *coaches who carry goods as well as passengers for hire*, wagons, teamsters, cartmen, the master and owners of ships, vessels, and all water craft, including steam vessels and steam tow-boats, belonging to internal as well as coasting and foreign navigation, lightermen and ferrymen. As they hold themselves out to the world as common carriers for a reasonable compensation, they assume to do, and are bound to do what is required of them in the course of their employment, if they have the requisite convenience to carry, and are offered a reasonable or customary price; and if they refuse without some just cause, they are liable to an action." 2 *Kent's Comm.* 2*d ed.* 598. The de-

NEW YORK, May, 1835.

Camden, &c. Company v. Burke.

fendants below are in a public employment; they are bound by their charter to convey passengers and goods, and would be liable to an action, were they to refuse. The counsel here adverted to and commented upon the cases of *Upshare* v. *Aidee*, 1 *Comyn's R.* 25; *Middleton* v. *Fowler* 1 *Salk.* 282; *Brooke* v. *Pickwick*, 4 *Bing.* 218; *Orange County Bank* v. *Brown*, 9 *Wendell*, 114; *and also cited* 2 *Kent's Comm.* 601; *Story on Bailments*, 325; *and* 1 *Bell's Comm.*475,to prove that coach proprietors, owners of steam-boats, &c. are liable as *common carriers* for the baggage of their passengers.

Nor can it be reasonably pretended that the plaintiffs in error are not liable, as common carriers, because of the restriction contained in the printed notice: "All baggage at the risk of the owners." The rule as to the liability of common carriers, as well as the policy on which it is founded, forbids such a conclusion. On this subject the English cases afford but little light; the notices which are usual there, merely restricting the liability of the carrier to a certain amount, unless a premium have been paid. The case of *Lyon and another* v. *Mells*, 5 *East*, 428, however, is very analagous. The action was against a lighter-man, for damage to yarn committed to his care, arising from leakage. The defendant had given notice, "that he would not be answerable for *any* damage, *unless* occasioned by want of ordinary care in the master or crew of the vessel; in which case he would pay ten pounds per cent. upon such damage, so as the whole did not exceed the value of the vessel and freight." On this ground it was contended the defendant was excused, having received the goods specially with the restriction contained in the notice, which, therefore, was to be regarded as constituting a special contract. But per Lord Ellenborough, Ch. J.: "In every contract for the carriage of goods between a person holding himself forth as the owner of a lighter or vessel, ready to carry goods for hire, and the person putting goods on board, or employing his vessel or lighter for that purpose, it is a term of the contract on the part of the carrier or lighterman *implied by law* that his vessel is tight, and fit for the purpose or employment for which he offers and holds it forth to the public; it is the very foundation and immediate *substratum* of the contract that it is so; the law pre-

sumes a promise to that effect, on the part of the carrier, without any actual proof, and every reason of sound policy and public convenience requires it should be so." And Parker, Ch. J., in *Dwight* v. *Brewster*, 1 *Pick.* 54, in speaking of the effect of a notice like the present, says: "It was manifestly intended to guard the proprietors from liability, in case the trunks, &c. should be stolen." Indeed, the very nature of the employment of the defendants, as well as every consideration of public policy by which the liability of common carriers is uniformly tested, show that the risks guarded against by the notice in question were exclusively extrinsic, and such as resulted from some othes cause than the nature of the conveyance itself. Upon this point it cannot be necessary to enlarge. The learned counsel himself hardly alludes to it in his argument, but rests himself entirely on other grounds, which will be briefly noticed upper the next point.

But even admitting that the plaintiffs in error are not liable as common carriers, still they were bound at all hazards to provide safe vehicles; and if the accident happened from a defect in the construction of the crane, they are liable although the defect was out of sight, and not discoverable upon ordinary examination, notwithstanding no actual negligence was shown in the management of the machinery. The argument for the plaintiffs in error on this point proceeds, it will be observed, entirely upon the ground of hardship a ground which the whole current of cases involving the liability of persons in the employment of carriers, whether strictly *common carriers* or not, totally disregards. In cases of this kind public policy has placed their liability upon the higher ground of protecting property against even possible fraud and negligence; and although in some instances the law has excused the party, where the act complained of was the result of some extrinsic accident, yet it never has gone the length of protecting him where the injury proceeded from the insufficiency of the means of conveyance provided by himself. This distinction, even admitting the cases cited by the plaintiffs in error and applicable only to *passenger carriers* to apply here, will be found running through the whole of them: they are all cases of extrinsic accident, resulting from a defect in the

NEW YORK, May, 1835. Camden, &c. Company v. Burke.

road, and against which it was impossible for human foresight to guard. The only one to which this remark does not apply is that of *Sharp* v. *Grey*, 9 *Bing*. 457, 23 *Eng. C. L. Rep*. 331, which was relied upon by the defendant in error in the court below, and which the learned counsel has only cited for the purpose of endeavoring to distinguish from the case at bar. Unless I wholly misapprehend the case, it is precisely in point for the defendant in errror. The facts were very similar to those in the present case. Without recapitulating them here, it is sufficient to refer the court to that case. The learned counsel however is mistaken in supposing that the question of extrinsic negligence was left to the jury, or had any thing to do with the decision. " *Tindal, Ch. J.* directed the jury to consider, whether there had been, on the part of the defendant *that degree of negligence* which was required by his agreement to carry the plaintiff safely." And all the judges, in confirming the verdict, put the case expressly on the the ground that the party was to be held liable at all events for the insufficiency of the axletree. *Park, J.:* "It is clear that there *was a defect in the axletree*, and it was for the jury to say whether the accident was occasioned *by what in law is called negligence in the defendant, or not.*" (In *Dale* v. *Hall*, 1 *Wils*. 281, the chief justice says "that every thing is negligence that the law does not excuse.") *Gaselee, J.:* "The burthen lay on the defendant to show there had been *no defect in the construction of the coach.* Whether there had been or not, was a question of fact on which the jury have determined. In *Christie* v. *Grigg*, 2 *Campb*. 79, cited by the plaintiffs in error, the accident was occasioned by a kennel which crossed the road, and not by any defect in the vehicle." (This remark not merely recognizes the distinction between intrinsic and extrinsic accidents, but expressly puts the liability of the defendant in the latter case upon the sole ground of the insufficiency of his vehicle.) But the other judges still more clearly express this principle. *Bosanquet, J.:* "The chief justice held that the *defendant was bound to provide a safe vehicle*, and that the accident happened from a defect in the axletree. If so, when the coach started, it was not *road-worthy*, and *the defendant is liable for the consequences upon the same principle as a ship owner who furnishes a vessel which is not*

*sea-worthy. Alderson, J.*: "I am of the same opinion; *a coach proprietor is liable for all defects in his vehicle which can be seen at the time of construction, as well as for such as may exist afterwards and be discovered on investigation.* The injury, in the present case, appears to have been occasioned by an original defect of construction; and if the defendants were not responsible, a coach proprietor might buy ill-constructed or unsafe vehicles, and his passengers be without remedy." The soundness of these principles seems to be beyond a question. The necessity and policy of holding persons in the capacity of the plaintiffs in error to the utmost strictness in the protection and preservation of lives and property, and the danger of relaxing the rule so as to place both at the mercy of a thousand accidents, depending on so nice a question as that of reasonable care or not, are equally obvious; and if the present case necessarily turned upon this point, it is apprehended the court would have little hesitation in repudiating the unsafe and uncertain doctrine contended for by the plaintiffs in error. If, however, any doubt should by possibility exist on this head, it is submitted that their liability as common carriers rests on too solid a foundation to be easily disturbed.

*Anthon*, in reply. The law of *cammon carriers*, as urged by the counsel for the plaintiff below, is not applicable to this case; that law is founded on the *custom of the realm of England* in a comparatively barbarous age, when law was as yet possessed of little vigor, when travelling was dangerous and the transportation of property unsafe, by reason of fraudulent and criminal combinations between the carriers and highways robbers. To cut up such combinations by the roots, carriers were held responsible at all events for the loss goods entrusted to them. But what has that to do with the inquiry in which we are at present engaged—a loss from a defect in the materials of machinery, which human skill can neither detect nor account for? Even in the case of a *common carrier* at the common law, if the damage or loss proceeds from a cause against which human foresight cannot guard, he is discharged; for this constitutes *actus Dei. Colt* v. *Mechen*, 6 *Johns. R.* 160. *Elliot* v. *Johnson*, 10 *Johns. R.* 1. *Story on*

NEW YORK, May, 1835.

Camden. &c. Company v. Burke.

*Bailments*, 338. Thus, for example, if the goods are damaged by lightning or tempest, or swallowed up by an earthquake, no man has ever pretended that the carrier could in such cases be liable; and for the simple reason that he could not guard against it. Such is the nature of the operating cause in this case; human skill, as the jury have found, could furnish no protection against it—for it remains undetected to the present day, it being fully proved that when the rope was examined by skilful men, after the accident, they were unable to discover it. To guard against this accident therefore was impossible: and it is an established maxim of law and sound sense, *ad impossibile nemo tenetur*. But it is insisted that this case is to be determined by the rules applied in the opening argument, or by those which govern the bailment of *hiring* or *locatio* of the civil law, or by some modification of those rules adapted to the advanced stage of society in which we live; and it is still urged that a law which would lay down two opposite rules of responsibility, according to the character of the chattels, whether *animate* or *inanimate*, the damage to each proceeding from the same occurrence, would be neither rational nor sound. To give a man the value of a mirror, worth six cents, destroyed by the breaking down of a vehicle, and to deny him compensation for damages sustained in his person by limbs fractured by the same accident, would be exceedingly strange; nor would the contradiction be at all relieved by the fanciful reasons furnished by the learned counsel, that one could and the other could not take care of itself; each being equally helpless when the peril was encountered. To apply the law applicable to the *bailment of hiring*, brings me to the consideration of the case of *Lyon* v. *Mells*, 5 *East*, 428, which the learned counsel for the plaintiff below also considers analogous to the case under consideration. I entirely agree with Lord Ellenborough in the opinion delivered in that case, "that, in every contract for the carriage of goods, it is a term of the contract that the vessel is fit for the employment for which he offers or holds it forth to the public." This is undoubtedly the general proposition; and it is on this implied assumpsit that the declaration in that case was framed, and on which the plaintiff below ought to have framed his, and not

on the ground of negligence, which the jury have in this case expressly negatived, and so defeated the action. If the action, then, had been properly conceived, and the declaration framed, as in the case of *Lyon* v. *Mells*, would not the defence have been complete? The jury having found that he had furnished a vehicle proper for the purpose, as far forth as human skill and foresight could go, would not this have been a perfect performance of his undertaking? I believe we have on both sides placed before the court all the cases our books furnish on this head; but inasmuch as the division of bailments, together with the rules of law governing each species, are derived from the civil law, a reference to that code, will not be uninstructive; and it so happens that on this subject of faults in the *vehicles*, which may or may not be discovered, and the consequent liability of the owner, the Pandects are very explicit: "ex hacquoque causa competit actio ex conducta si res *vitiosa* fuerit, verum interest an illud sit *vitium* quod *ignorare non deburit* locator an illud quod *juste ignoravit.*" *Dig. Lib.* 19, *tit.* 2, § 1. 7 *Pothier's Pandects, mises dans un nouvel ordre, p.* 260. Thus plainly stating, that when goods are damaged through the *fault* or *defect* of the article hired, the inquiry must be whether that defect was such as the owner might have known, or such as he could not have known by the exercise of any diligence or skill; for I am willing to give all this force to the term *juste*, in the last branch of the rule. For the first species of defect he is by that law answerable in damages, but not for the last; and in elucidation, two examples are then given: 1. If a man hire out, without knowing it, defective casks, whereby the hirer loses his wine, the owner shall answer in damages, and his ignorance shall not excuse him, because he might have made this discovery. 2. But it is otherwise if a man hires out a pasture, and poisonous herbs grow up in it, and kill the hirer's cattle. If the owner knew the fact, or could have discovered it, he shall answer in damages, but not otherwise. And after these examples, the law concludes with this rule, as plainly deducible from the whole matter: "Uno verbo, locater eo nomine item in id quod interest tenetus si *culpa* ejus argui possit." In one word, to

NEW YORK, May, 1835. Camden &c. Company v. Burke.

make the owner responsible for damages proceeding from a defect in the vehicle, he must be in *fault*. This is the doctrine for which the plaintiffs in error in this cause contend: that having been acquitted of all fault by the jury, they were entitled to the verdict; and this doctrine is fully supported by the cases relied upon in the opening argument. I do not think I insist upon any thing unreasonable, when I contend also, that these must be deemed rules engrafted on our law. Lord Holt, in *Coggs* v. *Barnard*, and Sir William Jones, on his classical treatise, have borrowed largely on this subject from the code of Justinian, and the rules so introduced by them are avowedly the law of the land. The case now under consideration demonstrates that the system built up by those celebrated lawyers, would be very incongruous and defective, without the adoption of the just rules for which the plaintiffs in error contend, and which are worthy of an enlightened age: that to the steam-boats, rail-roads, and machinery supplied under their charters, they shall apply all care, skill and science to make them perfect; and having done so, they shall be deemed to have fulfilled their undertaking so far forth as their vehicles and machinery are concerned.

*By the Court*, SAVAGE, Ch. J. The plaintiffs in error insist that they are *carriers of passengers;* that as such they are bound to supply carriages and machinery, sound and sufficient, as far as the eye and judgment can discover, and if an accident occurs, with the exercise of care and diligence, it is *actus Dei*, and they are not responsible. The defendant in error contends that the plaintiffs are *not only carriers of passengers*, but *carriers of goods; common carriers*, and answerable as such. *Story on Bailment*, 379, is referred to by both counsel, as stating the rule correctly as to *carriers of passengers*, where he says, "The passenger carrier binds himself to carry safely those who he takes into his coach, as far as human foresight and care will go; that is, for the utmost care and diligence of very cautious persons." But if, as the defendant's counsel contends, the plaintiffs are *common carriers*, they are, in the language of *Chancellor Kent*, 2 *Kent's Comm.* 527, "in the nature of insurers, and are answerable for accidents and

thefts, and even for a loss by robbery; they are answerable for all losses which do not fall within the excepted cases of the act of God, or inevitable accident." And though *notice* might be sufficient to excuse them from thefts and robberies, it would not from accidents occurring from the insufficiency of their own vehicles and machinery for the transportation of the goods.

It is certain that different rules have been applied to the transportation of *persons*, and the transportation of *goods*. The case of *Christie* v. *Griggs*, 2 *Campb.* 80, was a case of the former description. The plaintiff was badly bruised by the breaking down of the stage coach of the defendant; and on the trial, he proved the fact of breaking down from the failure of the axletree, and that he was severely injured. The defendant insisted that the plaintiff should go further, and show the insufficiency of the coach, or the unskilfulness of the driver: but Ch. J. Mansfield said the plaintiff had made out a *prima facie* case, and then lay with the defendant to show that his coach was as good a coach as could be made, and that the driver was as skilful as could be found. The defendant did produce evidence of the skilfulness of the driver, and that the axle had been recently examined, and no defect discovered. The Ch. Justice said that if the axletree was sound, as far as human eye could discover, the defendant was not liable. This case is relied on by the plaintiffs in error, and thus far would be strong in their favor, if the same rule was applicable to the carriers of persons and the carriers of goods; for it is not disputed that the rope which broke was apparently sufficient. But Sir J. Mansfield proceeds, and says there is a difference between a contract to carry goods and a contract to carry passengers; *for the goods the carrier is answerable at all events*, but he did not warrant the safety of his passengers. His contract with them was to provide for their safe conveyance, as far as human care and foresight would go. The same doctrine, that so far as *personal* injury is concerned, the question is entirely one of negligence, is found in 2 *Esp. N. P. Cases*, 533; and *Sharp* v. *Grey*, 9 *Bing* 457, sustains the same position. Chancellor Kent has briefly stated the law relating to this case: In the aggregate body of com-

NEW YORK, May, 1835.

Camden &c. Company v. Burke.

mon carriers are included the owners of stage waggons and coaches. 2 *Kent's Comm.* 598. The proprietors of stage coaches do not warrant the safety of passengers in the capacity of common carriers; they are not responsible for accidents, but for want of due care: but as to the baggage of the passengers, the modern cases place coach proprietors upon the ordinary footing of common carriers. *Ibid*, 600, 601. The proprietors of steam boats for the transportation of passengers and their baggage, are common carriers, and responsible for the baggage, without special compensation for it. *Allen* v. *Sewall* 2, *Wendell*, 327. 11 *Johns. R.* 109. 9 *Wendell*, 114. It is clear, therefore, that the same care and diligence which would excuse the carriers in case of accident to passengers, would not excuse them for damage to, or loss of goods. In the case of *passengers*, the carriers are responsible only for negligence; but in respect to their *baggage*, they are responsible as common carriers, and accident is no excuse. The reason for the distinction is not very apparent in the present state of society; but the difference seems to be settled upon authority.

The notice, it has been intimated, was probably intended to guard against liability for theft, or robbery or mistake, 1 *Pick.* 54; but the notice would *not* excuse from actual negligence or misconduct. The loss in this case was by accident, but by such an accident as in common carrier is accounted negligence. Whether the loss happened by the negligence of the defendants or not, it happened by their acts, or the acts of their servants; and for such losses the notice ought not to excuse them. The notice is general, and, according to its terms, imports entire irresponsibility under all circumstances; but it has never been understood to excuse the carrier from accidents arising from the breach of the implied agreement in all such cases, that the vessel, or coach, or vehicle, whatever it be, is sufficient for the business in which it is employed. 5 *East*, 428. As common carriers, the law imposes a liability upon the defendants. That liability was qualified by the notice, so far as to excuse them from losses happening by means of the conduct of others,

from robbery or larceny ; but not from such losses as arise <span style="float:right">NEW YORK,<br>May, 1835.</span> from the acts of themselves or their servants.

The result is, that although the proprietors of public conveyances are not responsible for injuries to the *persons* of passengers, unless they happen from the want of such care and diligence as is characteristic of cautious persons, yet they are liable for the *baggage* of passengers, at all events, except such losses as arise from inevitable accident, or the enemies of the country, where no notice is given.   Where notice is given that all baggage is at the risk of the owners,such notice excuses them from losses happening by theft or robbery, in addition to the exemptions from responsibility as common carriers, but not from losses arising from actual negligence, or from the insufficiency of their machinery or vehicles. The loss in this case arose from the insufficiency of the machinery ; and although it could not be discovered by the eye, yet for this the defendants are responsible at all events.