Supreme Court. Erie General Term, September, 1856. *Bowen, Marvin* and *Mullett,* Justices.

## The People *v.* Samuel Jillson.

Under the thirty-fifth section of the act of 1850, entitled " An act to authorize the formation of railroad corporations, and to regulate the same," a conductor of a train is protected against an indictment for assault and battery, for putting out of the cars a passenger who refuses to pay his fare, if he use no unnecessary force; and where a passenger has refused to pay his fare, and the train has been stopped for the purpose of putting him out of the cars, the right of the conductor to put him out is not taken away by his then offering to pay the fare.

The relations and rights of a passenger, as regards the railroad company in whose cars he travels, discussed by Mullett, J.

This was a *certiorari* to the court of sessions of Genesee county.

It appeared, by the return to the said writ, that Samuel Jillson was, on the 26th day of September, 1854, indicted in the said Court of Sessions, for an assault and battery on James McCormick, and that the indictment was tried in the said court on the 28th day of September, 1855; upon which trial the following bill of exceptions was taken by the counsel for the defendant, and signed and sealed by the court:

" It was admitted, on the part of the people and of the defendant, for the purposes of the said trial, that, during the month of August, 1854, the Canandaigua and Elmira Railroad Company were a corporation organized under the law of this state; that they operated a railroad from Elmira to Niagara Falls, through the villages of Le Roy and Batavia, and that the defendant was employed by them as a conductor on said road. It was proved on the trial that, in August, 1854, James McCormick, the complainant, took a seat in the cars of the company, at Le Roy, to be carried to Batavia, a distance of ten miles; that soon after the train left Le Roy the defendant, as the conductor of the train, came

to McCormick to receive his fare; that McCormick told him he was going to Batavia, a distance of ten miles, and tendered him a twenty-five cent piece as the fare; that the conductor declined to receive it, and told him the fare was thirty cents; that McCormick said he had frequently been carried over the road from Le Roy to Batavia, and had never paid but twenty-five cents; that the defendant told him the company had recently made a regulation requiring passengers who did not purchase tickets before taking their seats in the cars to pay at the rate of three cents a mile; that McCormick replied that he should not pay but twenty-five cents; that the defendant then told McCormick that he left no other way for him, the conductor, but to stop the train and let him, McCormick, get off; that McCormick said the conductor would have to put him off, as he should not pay but twenty-five cents; that the conductor then pulled the bell-rope, as a signal to the engineer to stop the train, and the speed of the train was slackened; that after the bell-rope was pulled and the train had slackened its speed, but before it had quite stopped, McCormick offered to pay the defendant the thirty cents, but the defendant told him that as he had obliged him to stop the train the offer was too late, and declined it; that the train having stopped, the defendant laid one or both hands on McCormick's shoulder or arms, without hurting him, and told him he must leave the train; and that thereupon McCormick said he would leave rather than to have a fuss, and voluntarily rose from his seat and left the train while it was not in motion. It was also proved that, in the fore part of July, 1854, the company made a regulation, to take effect on the fifteenth of that month, by which passengers not purchasing tickets before taking seats in the cars, should be charged at the rate of three cents a mile, and that printed notices of such regulation were posted, on the fourteenth of said July, in conspicuous places at the passenger station at Le Roy, and remained so posted there several months. It was also proved that the place where

the train was stopped, for the purpose of putting the complainant out of the cars, was near the Le Roy station and several dwelling-houses; and the District Attorney stated that he did not claim but that it was a proper place for that purpose, provided the defendant had a right in other respects to put him off. There was no conflict of evidence upon any material fact in the case.

The court charged the jury that the company had a right to make the regulation proved, and it was the duty of the defendant, as the agent of the company, to enforce it; that the complainant was bound to pay the fare demanded, and, having refused to do so, the defendant had a right, and it was his duty, to stop the train and put him off.

The defendant's counsel requested the court further to charge the jury that the defendant was not bound to receive the fare tendered after the signal to stop the train had been given and the speed of the train had slackened. The court refused so to charge, to which refusal and ruling of the court the defendant's counsel duly excepted.

The court further charged the jury that although the defendant had a right to put the complainant off the train on his refusal to pay the fare demanded, yet that right was done away by the complainant's subsequent offer to pay; and the defendant was bound to receive the fare, and permit the complainant to remain on the train. To which ruling and decision of the court the defendant's counsel duly excepted.

The defendant's counsel also requested the court to charge the jury that, in any view of the facts, the defendant, upon the law of the case, was entitled to an acquittal, but the court declined so to charge. To which refusal and ruling ruling the defendant's counsel duly excepted.

Upon which evidence the jury convicted the defendant; and the defendant's counsel presented, and the court signed and sealed, the above exceptions.

The People *v.* Jillson.

This *certiorari* was argued in this court, at the September general term, 1856, by

*Smith & Lapham*, for the plaintiff in error.

*S. Wakeman* (District Attorney), for the defendant in error.

*By the Court,* MULLETT, J.—Although the subject matter of the controversy between Jillson and McCormick, in a pecuniary point of view, appears to have been trifling, yet the principles involved in it are of great importance, both to railroad companies and to their passengers. That railroad corporations are to be deemed carriers of passengers, and as such subject to the duties and liabilities, and entitled to the privileges and powers, incident to that employment, seems to be now well settled by various judicial decisions, as well in this country as in England. ( *Camden and Amboy R. R. and Transp. Co.* v. *Burk,* 13 *Wend.,* 611; *Holbrook and Wife* v. *Utica and Schenectady R. R. Co.,* 16 *Barb. S. C. R.,* 113; *Hagerman* v. *Western R. R. Co, id.,* 353; *The Commonwealth* v. *Powers,* 7 *Metc.,* 576; 1 *Am. Railw. Cas.,* 396, note 1; *Pickford* v. *Grand Junction R. R. Co., Mees. & Wels.,* 372.)

As corporations, they have a privilege to use their own united powers and property in a particular way or business, as well for the benefit of the people generally as for themselves. They, like common carriers of property, exercise a public employment, which they have no right, unreasonably, to decline; but they are not, like common carriers, insurers of the persons carried, and absolutely liable for all injuries except those occasioned by the acts of God or a public enemy, though they are to conduct their business, in all its branches, with all the care which human prudence and skill can suggest. Anything short of this will make them liable for the consequences. (16 *Barb. S. C. R.,* 113, 355.)

A railroad company, both as the proprietors of their road, the houses, buildings, engines and other real and personal property connected with the road, and as carriers of passengers, have authority to make reasonable and suitable regulations in regard to persons proposing to pass or repass on the road in the passenger cars, and in regard to all other persons making use of such road, houses, buildings, engines or property. Such authority is incident to the ownership of the property, and to their employment as passenger carrrers; and all such regulations will be deemed reasonable which are suitable to enable the company to perform the duties they undertake, and to secure their own just rights in such employment, and also such as are necessary and proper to insure the safety and promote the comfort of passengers. (7 *Metc.*, 596; *S. C.*, 12 *id.*, 482; *Cheney* v. *Boston and Maine R. R. Co.*, 11 *id.*, 121; *Chillon* v. *London and Roydon R. R. Co.*, 5 *Eng. Railw. Cas.*, 4; *Eastern Counties R. R. Co.* v. *Broom*, 2 *Eng. L. and Eq.*, 406; *Roe* v. *Birkenhead and Lancashire R. R. Co.*, 7 *id.*, 546.)

The power which the company have to make and enforce such regulations they may delegate to suitable officers, as agents of the company. Indeed, this is the only mode in which a corporation aggregate can exercise its powers. (7 *Metc.*, 596.) The regulations which the company may make do not partake of the nature of penal laws, to punish the passenger for having done or neglected to do any act, but are simply an annunciation of the terms and conditions upon which the company propose to let the passengers have seats in their cars, or to partake of the use of their road, or some part thereof, for the time being. They are made to regulate the future intercourse between the carriers and the passengers, and not to redress or punish former violations of duty. In the case of *Hall* v. *Powers* (12 *Metc.*, 482), the Supreme Court of Massachusetts refused to sanction the proposition that a superintendent of a railroad station had a right to order a person to leave the station and not to come

The People v. Jillson.

there any more, and to remove him by force if he did come, if, in the judgment merely of the superintendent, such person had violated the regulation of the company, but conceded that the superintendent might rightfully remove persons who actually violated such regulation. (*Am. Railw. Cas.*, 396, *note* 1.) By the above proposition it appears that the relation between a railroad company and him who travels on the road as a passenger is not founded upon a contract, express or implied, but is governed by the general duties of the company as a common carrier of passengers, and such reasonable and proper regulations as the company may, from time to time, make for the security of their own just rights and the safety and comfort of the passengers. The passenger, by availing himself of the privileges of a passenger, assumes the duties of one. The whole relation is formed with railroad rapidity and accuracy. The railroad company, by being the owner and having the possession of the road, cars, and machinery for running them, and being responsible for the safe and proper conducting of that business, has the power as well as the right to enforce a compliance with the terms of this relation on the spot. This right they have as well by the general principles of the common law as by the statute. (*Laws of* 1850, 231, § 35.)

In the case under consideration, McCormick had taken his seat as a passenger. This he had a right to do without any contract or agreement with the conductor or company for that purpose, unless the conductor for some cause connected with the general conduct of his business, or the safety or comfort of his passengers, had forbidden him. By taking the seat he assumed the duties of a passenger, one of which was to pay the fare when called on. By the thirty-fifth section of the act of 1850, to authorize the formation of railroad corporations, and to regulate the same, it is declared that, " if any passenger shall refuse to pay his fare, it shall be lawful for the conductor of the train and the servants of the corporation to put him and his baggage out of the cars, using

no unnecessary force, at any usual stopping place, or near any dwelling-house, as the conductor shall elect on stopping the train." If McCormick, in this case, did not violate the thirty-fifth section of the railroad act of 1850, it is difficult to understand how he could do so. When the conductor called upon him for his fare, told him what it was, and even referred to the regulation of the company fixing it at the amount demanded, McCormick replied that he should not pay but a less sum, naming it, and when the conductor then told McCormick that he left no way for him, the conductor, but to stop the train and let him, McCormick, get off, McCormick replied that the conductor would have to put him off, as he should not pay but the sum which he had offered; thus distinctly refusing to pay the fare and in effect defying the conductor to put him off. Under such circumstances it was the conductor's duty to put McCormick off the cars immediately, with as much expedition as was consistent with his safety and the safety and convenience of the other passengers. He had no right to detain or delay the train to dispute with an obstinate passenger about the amount of the fare. By refusing to pay the fare demanded, McCormick relinquished his privilege as a passenger and ceased to have any right in the cars, and the conductor was authorized to put him out as an intruder. It could not be that, while the conductor was rightfully engaged in putting a person out of the cars as an intruder, such person could, by his own act, acquire a superior right to remain.

Although, from the general nature of the business of a railroad company as carriers of passengers, and the general invitation which they hold out to persons to become passengers, persons, if not forbidden, have a right to take seats in the cars, as passengers, and to retain them, on complying with the regulations for running, without any particular contract for that purpose; yet, it appears to me that a conductor of a train of cars, as the agent of the owners, to enable him properly to manage the business, engines and property

entrusted to his care, and to provide for the safety and comfort of the passengers, must have some power over the reception, rejection and expulsion of passengers, governed in some degree by his discretion, but for the reasonable and proper exercise of which he is responsible, and that the exercise of that discretion will be presumed to be reasonable and proper, unless shown to be the contrary.

Therefore, in the case under review I am of the opinion that the Court of Sessions erred in charging the jury " *that, although the defendant had a right to put the complainant off the train on his refusal to pay the fare demanded, yet that right was done away by the complainant's subsequent offer to pay, and that the defendant, under the circumstances of the case, was bound to receive the fare and permit the complainant to remain on the train,*" and that for this error the verdict in the Court of Sessions must be set aside and a new trial granted.

Conviction reversed and new trial ordered.