By the Court,
Bronson, J.
On the main question little need be added to what was said when the case was before us on a former occasion. (3 Hill, 9.) As the defendants were not common carriers of the boats which they towed, the parties met upon equal terms. Neither was under a legal necessity to contract with the other, and both were at liberty to make such a contract as they thought proper, provided there was no transgression of the law of the land. Whatever pains the defendants might have taken in building, fitting and manning their steamboats, it was still quite possible that losses might happen, either through the insufficiency of the boats or machinery, or the unskilfulness, negligence, or other misconduct of the master and hands. ' These, as well as the other risks of the voyage, were to be borne by some one, and the question on whom the burden should rest, must necessarily affect the price to be paid for the towing of boats. It was as competent for the parties to agree Which should ran the hazard, as it was to settle the amount of compensation.
In the Absence of an express agreement, the law would im-1 pose certain duties and liabilities upon both parties. The plaintiffs would be bound to pay a reasonable price for the towing, and the defendants would be answerable for any loss which might happen through the want of ordinary care and skill on the part of their servants. But the parties might, by contract, fix the price of towing as high or as low as they pleased, and shift the hazards of the business from one party to the other as they deemed proper. They might agree that the defendants should incur an increased liability, and answer for the safe delivery of the goods at all events; or that they should be wholly exempt from liability so long as they were not chargeable with fraud. Now here the parties settled the matter, both as to price and peril, for themselves. They agreed that the Astorogan should be towed to Albany for the sum of thirty dollars “ at the *538 risk of the master and owners thereof.” A loss has happened, and the question is, who shall bear it? We think the plaintiffs must bear it, because such was their agreement. It is impossible to say that the contract points to title kind or description of risk more than another; and if it does not cover all the perils of the voyage, it covers none, and means nothing. Courts are not at liberty to nullify contracts by way of expounding them, or to insert resirictions or qualifications which the parties did not think proper to make for themselves.
In this view of the case, it is unnecessary to inquire whether there was any thing like gross negligence on the part of the master of the steamboat or his hands; for should it be conceded that they are chargeable with gross negligence, the loss must still fall upon the plaintiffs. They agreed, for a sufficient consideration, that they would take the risk, and now that the loss has happened, they are not at liberty to cast off the burden upon the defendants.
The owner of a ship may cause himself to be insured against the barratry of the master, although appointed by himself; and I can see no reason why these parties were not at liberty to agree, that a loss happening through the negligence of the master and hands, whatever might be the degree of fault, should fall upon the plaintiffs. And if the contract is not set aside by considerations of public policy, we have no choice but to enforce it.
We think the nonsuit was properly ordered, and it only remains to notice some minor questions made upon the trial.
The plaintiffs gave no explanation on the trial as to the purpose for which the advertisement was offered in evidence. The steamboat New-London was not mentioned in it, and no one would be likely to see how it could have any legal bearing upon the cause. The plaintiffs should have explained to the circuit judge. But if we take their explanation on the argument, it will not help the case. They say the advertisement was proper evidence to show that the defendants were common carriers in the towing of boats. We think that, as matter of *539 law, the defendants were not common carriers in respect to the boats which they towed.
The remaining question is upon the offer to prove negligence in the employment of the pilot. The charge in the declaration is, that the “ defendants, by their servants, so carelessly, negligently and unskilfully then and there steered, managed and conducted their said steamboat,” that the Astorogan was run upon the rocks and sunk. The substance of the charge is, that the loss was occasioned by the fault of the servants in steering the boat, and not through any want of care in employing them. But if we reject the words “ by their servants,” the allegation will still be, that the steamboat was improperly “ steered, 'managed and conducted,” which is a different thing from saying there was negligence in employing the pilot. (Mayor v. Humphries, 1 Carr, & Payne, 251; Hullman v. Bennett, 5 Esp. R. 225; Breedlove v. Turner, 9 Mart. Louis. Rep. 353.) Where the gist of .the action is negligence, the party is confined to the species of negligence alleged. The proof must support the declaration. The plaintiffs have left us no room to doubt that here was a variance. They had been giving evidence to support the charge in the declaration of negligence in steering the boat. Finding themselves met by the special contract, they then changed their ground, and offered to show negligence in employing the pilot “ as a distinct gravamen or ground of liability.” They thus admitted, what appears to be quite evident, that there was a substantial difference between the charge in the declaration and the proof offered.
There are other difficulties lying beyond, the objection, for variance. The only fact which the plaintiffs offered to prove was, that the pilot was not skilful. That fact, standing alone, would not make out that there was negligence in employing him. Notwithstanding the want of skill, it may be that the pilot came to the defendants highly recommended, or that all reasonable diligence was used to ascertain his qualifications before he was employed. The plaintiffs should have gone further, and offered to show that the defendants knew the pilot was wanting *540 in skill, or that they omitted to make proper inquiries before the man was employed.
J. A. Spencer dp M. T. Reynolds, for the plaintiffs in error.
1. The defendants were common carriers, and responsible as such. (Smith v. Pierce, 1 Louis. Rep. 349; Adams v. The New-Orleans Steam Tow-Boat Company, 11 id. 46; Sproul v. Hemmingway, 14 Pick. 1; Coggs v. Bernard, 2 Ld. Raym. 913, 917, 918.)
2. But if the defendants were not common carriers, they were bailees for hire, and bound by the nature and character of their etnployinent to use ordinary and reasonable care, diligence and skill, in the performance of what they had undertaken. (Story On Bailm. 298, § 457; 2 Kent's Comm. 585, 586, 591, 592.)
3. The instrument called a permit was not a contract between the parties; but if it was, it did not exempt the defendants from the obligation to use ordinary care, diligence and skill, (Schieffelin v. Harvey, 6 Johns. 170; The Camden & Amboy Rail-Road &c. v. Burke, 13 Wend. 611; Fairchild v. Slocum, 19 id. 329, 332.)
4. Giving to this instrument, however, the utmost force and effect which can be allowed to it, the defendants were certainly responsible for fraud, breach of good faith or. gross neglect, on the part of their servants or agents, and so the circuit judge held. (Batson v. Donovan, 4 Barn. & Ald. 21; Birkett v. Willan, 2 id. 356; Bodenham v. Bennett, 4 Price, 31; Lowe v. Booth, 13 id. 329; Brooke v. Pickwick, 4 Bing. 218; Riley v. Horne, 5 id. 217; Duff v. Budd, 3 Brod. & Bing. 177; The Camden & Amboy Rail-Road &c. v. Burke, 13 Wend. 611; Fairchild v. Slocum, 19 id. 329; Dwight v. Brewster, 1 Pick. 50; 2 Kent's Comm. 561, 2, 606, 7; Story On Bailm. 15, § 21; 2 Bl. Comm. 453; Jones Bailm. 46, 7, 49, 120; Foster v. The Essex Bank, 17 Mas. Rep. 479.)
*540 If there had been no special contract about the towing, the plaintiffs would have been at liberty, to prove that the pilot was wanting in skill, because, however diligent and careful the defendants might have been in employing him, they were answerable for a loss happening through his incapacity. But by the special contract the plaintiffs had taken that risk upon themselves.
The view which has been taken of the case renders it unnecessary to examine some of the questions which were so elaborately discussed at the bar.
Judgment was accordingly rendered in favor of the defenV dants, and the plaintiffs thereupon brought error to this court.
5. Here was strong evidence of the most culpable ignorance or carelessness on the part of the persons in charge of the Mew-London, and such as would have justified a jury in finding the fact of gross negligence. (McKinney v. Neil, 1 McLean's Rep. 540; Stokes v. Saltonstall, 13 Peters' Rep. 181; Smith v. Pierce, 1 Louis. Rep. 349; Christie v. Griggs, 2 Camp. Rep. 79; Jeremy's Law Of Carr. 29; Riley v. Horne, 5 Bing. 217; Platt v. Hibbard, 7 Cowen, 497; Camden & Amboy Rail-Road &c. v. Burke, 13 Wend. 611; Ware v. Gay, 11 Pick. 106, 112; Lamb v. Palk, 9 Carr. & Payne, 629; Dygert v. Bradley, 8 Wend. 469; Blin v. Campbell, 14 Johns. Rep. 432.)
6. The degree of negligence, so far as that was material, was for the jury to determine. Even if the question was one of gross negligence, therefore, the circuit judge erred in nonsuiting the plaintiffs, instead of letting the cause go to the jury. (Smith v. Horne, 2 J. B. Moore, 18; 8 Taunt. 144, S. C.; Foot v. Wiswall, 14 Johns. Rep. 304; Jeremy's Law Of Carr. 29; Riley v. Horne, 5 Bing. 217; Bodenham v. Bennett, 4 Price, 31; Lowe v. Booth, 13 id. 329; Colt v. McMechen, 6 Johns. Rep. 160; Beardslee v. Richardson, 11 Wend. 25; Batson v. Donovan, 4 Barn. & Ald. 21; Chitty On Contr. 154, Am. ed. of 1827; Tracy v. Wood, 3 Mason's Rep. 132; Duff v. Budd, 3 Brod. & Bing. 177; Langley v. Newman, 1 Moore & Payne, 583; Moneypenny v. Hastland, 1 Carr. & Payne, 352; Storer v. Gowen, 6 Shepl. Rep. 174; 1 Leigh's N. P. 527; Doorman v. Jenkins, 2 Adol. & Ellis, 256.)
7. The circuit judge excluded competent and proper evidence on the trial, and for this reason, if for no, other, the judgment should be reversed.
N Hill, Jun. <Sp S. Stevens, for the defendants in error.
1. The circuit judge committed no error in rejecting the evidence offered by the plaintiffs on the trial. The evidence as to the advertisement was plainly irrelevant, and was properly rejected for that reason. So in respect to the evidence offered as to the unskilfulness of the pilot. The only facts embraced by the offer were, that the pilot was unskilful, and that he had charge of the New-London when the accident happened. These, if admitted,' would not show that the defendants were .guilty of negligence in employing him. Besides, the offer was to prove negligence in this particular as “ a distinct gravamen or ground of liability and the evidence was therefore inadmissible under the pleadings. The cause of action set forth in the declaration was negligence in steering and managing the New-London after she had started, and negligence in employing an unskilful pilot is a very different charge, requiring different proof both to maintain and rebut it. (Mayor v. Humphries, 1 Carr. & Payne, 251; Breedlove v. Turner, 9 Mart. Lou. Rep. 353, 359, 380; Aldrich v. Brown, 11 Wend. 576; Hullman v. Bennett, 5 Esp. Rep. 226; Fitzsimmons v. Inglis, 5 Taunt. Rep. 538.)
2: The defendants were not common carriers of the Astorogan or her cargo. (Caton v. Rumney, 13 Wend. 387; Alexander v. Greene, 3 Hill, 9; Story On Bailm. 503, § 496, 3d ed.) They never had possession of her as common carriers. Her master and crew remained on board; and the captain of the New-London could not interfere with their posssession. (East India Company v. Pullen, 1 Strange, 690; Brinde v. Dale, 8 Carr. & Payne, 207; Farnsworth v. Packwood, 1 Holt, 207, and note; Story On Bailm. §§ 468, 483, 4.) Nor had the defendants the rights of common carriers in other respects. They could maintain no action for injuries done to the Astorogan or her cargo, for' they had no special property in either. (2 Bl. Comm. 452, 3.) The defendants, moreover, never held themselves out to the public as common carriers, or professed a willingness to incur the risks incident to that relation. (1 Bell’s Comm. 466.) On the contrary, they uniformly insisted upon their right of refusing to carry for any except such as would contract specially in respect to the price of towing, and the risks to be incurred. (Story On Bailm. § 508; Gordon v. Hutchinson, 1 Watts & Serg. 285, 288; 4 Law Rep. 144, 146, S. C.; Sheldon v. Robinson, 7 New-Hamp. Rep. 165.) Nor are the defendants within the reason "of the rule applicable to common carriers, which was established to guard against frauds and thefts that they might be tempted to commit or countenance, in respect to goods under their exclusive charge, while the owner and his servants were absent. (1 Bell’s Comm. 466; Per Best, Ch. J. in Riley v. Horne, 5 Bing. 217; 2 Moore & Payne, 331, S. C.; Story On Bailm. § 491; Per Bockee, Senator, in Van Santvoord v. St. John, 6 Hill, 164, 5; Per Nelson, J. in Orange County Bank v. Brown, 9 Wend. 114.) This rule has always been regarded as harsh and rigorous in the extreme, and courts have in various instances refused to extend it to new cases. (Boyce v. Anderson, 2 Peters’ Rep. 155; Powell v. Myers, 26 Wend. 598, per Verplanck, Senator; 5 T. R. 399, per Gross, J.; 1 Stark. Rep. 148, per Lord Ellenborough; 12 Johns. Rep. 233, per Spencer, J.; 6 Hill. 168, per Rhoades, Senator.)
3. But even if the defendants were common carriers of the Astorogan and her cargo, they had a legal right to contract for exemption from liability as to all losses or injuries which might arise from any cause except their own personal fraud or breach of good faith. (Chitty On Contr. 487, Am. ed. 1842; Story On Bailm. §§ 31, 2, 549; Maving v. Todd, 1 Stark. Rep. 72; Leeson v. Holt, id. 186; Coke Litt. 89, a; Aleyn’s Rep. 93; 4 Coke's Rep. 84; Morse v. Sluce, 1 Ventr. 190; Tyly v. Morris, Carth. 485; Gibson v. Paynton, 4 Burr. 2298; Nicholson v. Willan, 5 East, 507; Harris v. Packwood, 3 Taunt. 271; Orange County Bank v. Brown, 9 Wend. 115.)
4. The permit under which the Astorogan was towed shows that the plaintiffs agreed, for a valuable consideration, to assume the entire risk of every accident which might take place during the voyage, unless it arose from fraud or bad faith on the part of the defendants themselves. (Leeson v. Holt, 1 Stark. Rep, 148, 9; Story On Cont. 153,4; 2 Evans' Poth. 37, 8.) They had a right to contract for exemption from liability for the negligence and even the frauds of those in charge of the New-London; (1 Phill. On Ins. 230, 1st ed.;) and the permit shows they did so.
5. But if the defendants were liable, notwithstanding the permit, for the gross neglect of the captain and crew of the New-London, the evidence was not sufficient to warrant the judge in submitting the case to the jury upon that question. Gross negligence is deemed in law a breach of good faith, or a fraudulent omission of duty; and when the cases speak of gross negligence or fraud, the terms are used as synonymous. (Jones On Bailm. 7, 8, 11, 14, 22, 46, 97 a, 118, 119, 120; Coggs v. Bernard, 1 Comyn’s Rep. 134; 2 Bl. Comm. 452; 1 Cowen’s Treat. 56, 7, 2d ed.; 17 Mass. Rep. 498, 500, 1.) To maintain an allegation of this species of negligence, therefore, the proof should be entirely clear, leaving no room for rational doubt. The law presumes against it, and this presumption, will prevail, unless repelled by unequivocal evidence. (Williams v. The East India Company, 3 East, 192; Kinlock v. Palmer, 1 Rep. Const. Ct. So. Car. 224; Livingston ads. Fox, 2 Bay’s Rep. 520, 1; Marshall v. Lewis, 4 Litt. 140, 145; Hardin v. Bard’s heirs, Litt. Sel. Cas. 346; Starr v. Peck, 1 Hill’s Rep. 272, 3; Sill v. Thomas, 8 Carr, & Payne, 762; Fort v. Metayer, 10 Mart. Louis. Rep. 439; Fleming v. Slocum, 18 John. Rep. 405; Cooper v. Barton, 3 Camp. 5, note; Finucane v. Small, 1 Esp. Rep. 315; Story On Bailm. §§ 212, 213, 339, 410.)
Bockee, Senator.
The principal question in this case, viz. whether the owners of steamboats engaged in the business of towing are liable as common carriers, is one of great public interest. “ A common carrier is one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place.” (Story On Bailm. § 495.) The incidents which the law affixes to this employment are, that the carrier has the-control and possession of the goods, and *545 a qualified property in them, and is responsible for their safe delivery. It is apparent that the defendants in this case had not the custody of the goods on board the canal boat, nor any control over them. The canal boat and her cargo remained in the possession of her master and crew, and the conductors of the steamboat had no power or control over either, except for the single purpose of fulfilling their contract of towing the boat to Albany. The powers, duties and responsibilities of the defendants differ very essentially from those of common carriers. The towing of boats by steam power is a new occupation, consequent upon modern improvements and discoveries. The defendants may be considered as vendors of the steam power, and as pilots held responsible for the skilful and diligent performance of their engagement. It was the opinion of those distinguished jurists, Chief Justice Marshall and Judge Spencer, that the law relating to common carriers was one of great rigor, and that though the extent to which it had been carried might be justified by necessity and policy, it ought not to be extended, or applied to new cases. And accordingly, Chief Justice Marshall refused to apply it to the case of transportation of slaves, although chattels by law. (Boyce v. Anderson, 2 Peters' Rep. 150. See also Roberts v. Turner, 12 John. Rep. 232.) The defendants are not common carriers in fact, nor even bailees for hire.- The service which they undertake to perform is entirely different, and they ought not to be subjected to a rule which would make them liable for losses incurred without any neglect or default of their own.
Laying out of view the alleged contract or permit, the defendants would doubtless be liable for ordinary neglect oh their own part, or on the part of their agents or servants. Justice and policy both require that they should be held responsible to this extent. The immense interests concerned in the business in question demand that the law relating to it should be certain, clearly defined and well understood ; and it is important to make such an application of the law as will tend to secure the exercise of vigilance and skill in the navigation.
Can we give to this permit the effect to discharge the defen *546 dants from all liability ? Chief Justice Bronson was of that opinion, and thought the defendants were not liable even for the gross negligence of the officers and agents on board the steamboat. According to this view, if all the conductors of the steamboat should be drunk or asleep, and the flotilla be cast upon the rocks or the shore, wheresoever the winds or the storm or the steam might carry it, the defendants would be held irresponsible, I consider this proposition unreasonable and unsafe. The defendants must be responsible at least' for gross negligence ; and whether the running of the Astorogan upon a rock, notorious to navigators of the Hudson, which, is bare at low water, and over which at other times the water ripples, was proof of negligence in a greater or less degree, was a proper question for the jury, and ought to have been submitted to them,' Qn this.. ground alone ■ the nonsuit was improperly granted,
. But I go farther, and am of the opinion that, notwithstanding the permit, the exigencies of this case require the owners of the steamboat to respond for losses occasioned by the want of ordinary skill and care on the part of their agents. The course of this business or employment of towing boats by steam is generally entrusted to the management of agents. The public and those contracting with the proprietors have a right to presume that those agents, to whom so. much of property and human life is entrusted, are competent and vigilant. It is a crime knowingly and without due precaution to give employment in this capacity to unskilful, incompetent and careless men; and how can the employment of skilful and vigilant agents, masters, engineers and’ pilots, be better secured, than by holding the proprietors responsible for losses caused by ordinary neglect in the conducting and management of the steamboat?
As to the construction to,be given to the .language of the permit, it may be that the stipulation for towing the Astorogan to Albany 11 at the risk of the master and owners thereof,” was intended to embrace that large class of risks incident to navigation, not arising from the negligence of the conductors of the steamboat. It is equivalent to saying, “ we do not insure,” and *547 is perfectly consistent with the requirement of the law that the defendants, their agents and servants, in conducting their part of the operation, should exercise reasonable skill, care and diligence. It would in my view be preposterous to construe this permit into a license that the managers of the steamboat might be as inefficient, as indolent and reckless as they pleased. True, as a general rule, the operation of law may be controlled by the agreement of the parties; but this rule is' subject to many exceptions and qualifications. If the permit had been intended to exempt the defendants from the consequences of their own negligence, which the law fixes upon them, such intention ought to have been clearly and unequivocally expressed, so as to leave no room for doubt or misconstruction. (Per Van Ness J. in Schieffelin v. Harvey, 6 John. Rep. 180.)
It is doubtless true, as the chief justice states, that these parties might agree that the defendants should inéur an increased liability by answering for the safe delivery of the goods at all events. But the truth of the converse of the proposition, viz. that they might agree upon a total exemption from liability, is not equally obvious, if carried to the extent of protecting negligence and shielding delinquency. In my view there are decisive and controlling considerations of public policy which would render such a contract void if made. But in this case I conceive no such contract was made, and the defendants remained liable for losses occasioned by ordinary neglect, and so the case ought to have gone to the jury.
The nonsuit was improperly granted, and the judgment of the supreme court should be reversed.
Lawrence, Senator.
The defendants were engaged in carrying freight and towing boats on the Hudson river between New-York and Albany, by means of steamboats, in the year 1837. They announced to the public their occupation and business, and sought the patronage of those engaged in commerce on the river and canals.
The circuit judge held at the trial that the defendants' were liable, so far as their towing was concerned, "only for fraud, *548 breach of good faith, or gross neglect; and that they were not common carriers. The supreme court went further, and decided that they were not even liable for gross neglect, and put the case on the ground of contract between the parties; insisting that the entire risk was with the plaintiffs.
I think both the circuit judge and supreme court were clearly in error. Under the most favorable view of the subject, we are bound to hold the defendants responsible for ordinary care and skill, and this is a question which should have been submitted to the jury, on the proof given. The case shows most conclusively, that there was an entire absence of carfe on the part of the defendants or their servants, or a total want of skill, either of which is sufficient to bind the defendants to make good the loss. It would be not only against public policy, but in the highest degree dangerous, to permit the defendants to hold out inducements to"the public to employ them, and not make them responsible for ordinary care and ordinary skill.
Here was a channel near 400 feet in width, where large tows or flotillas were in the habit of passing, without danger or difficulty. On one side were dangerous rocks; but they occupied a position well known to all acquainted with the river, as the evidence clearly shows. If the pilot in the employ of the defendants did not know where these rocks were located, then the defendants are chargeable with want of skill. It was clearly their duty to have one on board the steamer who was well acquainted with the channel, as well as all the shoals and rocks. If he knew the position of these rocks, and run upon them from want of care, the defendants are equally liable. It was their duty to have a man at the helm who would not sleep at his post, and thus endanger the property and lives of those entrusted to their care. This view of the case is sufficient, in my judgment, to make it the duty of this court to reverse the judgment of the court below.
But there is another and still more important view of this case, so far as principle is concerned. I think the courts below were both in error in-supposing the defendants were not common carriers. I am* aware that learned and distinguished jurists *549 have, in certain cases, deprecated the extension of the rules of law on this subject, and I do not seek to extend them. All that the plaintiffs contend for is, that we shall apply these rules, which have been recognized and acted upon for ages, to the case before us. It must be recollected thqt the judicial opinions to which I allude were expressed when this mode of transportation was comparatively unknown to our commerce. And it is well known that those who expressed these opinions did not represent the present views of the judiciary, or of the public, on this subject. A large proportion of the carrying trade upon our lakes and rivers is now done in this way, and in all human probability steam power will ere long to a great extent be used on our canals.
I think the weight of authorities are decidedly in favor of holding the defendants as common carriers. In what respect is this-case different from that of a steamboat receiving on deck a stage-coach with its passengers, or a truckman with his load 1 There the captain of the steamboat has a general control over the vehicles taken on board, and can assign them a place where he chooses, and change it as occasion may require. He has a general control for the purposes of the voyage and no other. So in this case. These boats which were taken in tow were as completely tinder the control and direction of the captain of the steamboat as if they were on the deck of the steamer; and oven more so, because he had a right to command the services of the crew of the sevéral boats, who were, for the purposes of the voyage, a part of the general crew of the flotilla. There are a great variety of cases in which a common carrier may be employed in carrying others engaged in the same occupation. Such is the case before us.
There is no weight in the objection that the defendants could not maintain an action for a trespass committed on the boat in tow. This certainly cannot be true. Suppose another steamer should run into a flotilla of this kind, and damage the boats and their cargoes. Could any one successfully contend that the owners of the towboat could not recover in" an action for the damages sustained ? I think not.
*550 This subject has been ably treated in the Louisiana courts, and they have gone the full length of the doctrine contended for here by the plaintiffs. Situated as the people of that state are, upon one of the greatest inland thoroughfares of the new world, their example should have great weight in deciding this cause. In Smith v. Pierce, (1 Louis. Rep. 349,) will be found a decision in all respects precisely in point. A few extracts from the opinion in that case, delivered by Judge Mathews, will show that the court have taken a correct view of this subject. He says: “ The main question to be settled is, whether the owners of steamboats, used for towing vessels, are to be held responsible as common carriers. This business is so new, that nothing strictly relating to the obligations imposed on those who pursue it, can be expected to be found in ariy legal treatise, or adjudged cases. Their just standing in this respect must be sought in analogy. Common carriers are those whose trade it is to c.arry goods for hire. The trade of the owners of tow-boats in this city, is to convey, carry or tow vessels from this place down the Mississippi to its mouths, over the bar and out to sea; and to bring from certain points near to those mouths, ships or vessels into the port of New-Orleans; and for these services they offer their steamboats to serve the public for hire. According to this definition of a common carrier, and the description of the business and trade of the owners of tow-boats, it is not easy to distinguish the trade and occupations of the one from the other; and if these be similar, the same responsibilities should be attached to the conduct of both.”
The case of Boyce v. Anderson, (2 Peters' Rep. 150,) which is relied upon here by the defendants, was examined by Judge Mathews in the above case of Smith v. Pierce. From the reporter’s head note to Boyce v., Anderson, it appears to have turned on the point that the law regulating the' responsibilities of common carriers does not apply to the case of carrying intelligent beings, such as negroes, for the reason that the common carrier cannot have the same absolute control over them that he has over inanimate matter. Judge Mathews very properly insists that the case had there *551 fore no application to the one he was examining, and in this I think he was clearly right. In conclusion he remarks: “ We are of opinion that the situation of proprietors of towboats and the business they undertake, cannot legally authorize a relaxation of the severity and rigor of the rules applicable to common carriers.
The case of Adams v. The New-Orleans Steam Tow-Boat Co., (11 Louis. Rep. 46,) is one confirming the previous decision made in Smith v. Pierce.
In Sproul v. Hemmingway, (14 Pick. Rep. 1,) the supreme court of Massachusetts admit the correctness of the doctrine laid down by the courts in Louisiana. And Judge Story sustains the same view of the question in strong and emphatic terms. (Story On Bailm. § 495, lst ed.) (a)
I consider it useless to multiply authorities on this point. It is a fact which cannot be controverted that their weight is on the side of making the defendants liable as common carriers.
Public policy and public safety require it, añd I trust this court will not hesitate to do it.
Rhoades, Senator.
The introduction of steam navigation has been the means of establishing a business which is new in the commercial affairs of this state; and the towing of boats by steam power has become a matter of great and increasing importance to the interests of the whole community. The question in regard to the extent of the liability to which towboat companies or individuals should be subject, while engaged in towing boats for hire on our rivers and other waters, is one involving some principles which have not been considered in the cases heretofore adjudged relating to the liabilities of those engaged in the business of transportation.
It appears that the defendants in error were engaged .in the business of transportation on the Hudson river, between Albany and New-York, and that they not only carried freight in boats *552 and barges of their own, but that they regularly took canal boats belonging to others in tow, which they transported between the two places for a stipulated price or compensation. So far as they were engaged in carrying property on board their own boats, there can be no doubt they were common carriers, and subject to liability as such.v The important question is, were they common carriers in respect to the boats which they took in tow 1
They stand before the public as being engaged in two modes of transportation; one in carrying the property of others on board, their own boats, and the other in towing the property of others; both for the same object, at the same time, and by the same agency. In order therefore to constitute any distinction in respect to their liability, it must I think appear that there is such a difference in the nature of the two modes of transportation as to furnish a sufficient reason why they should not be held equally liable in both cases; or it should be shown that they have not held themselves out to the public, so far as the business of towing is concerned, in such a manner as to bring them within the description of common carriers. If there are no good reasons which should bring them within the rule of law as applied to common carriers, the rule as respects them should be inoperative; for when the reasons for the law cease, there should be a cessation of the law itself.
It does not appear but that the conductor of the steam tow-boat has all the control over the boat taken in tow which is necessary for the security and safety of it while navigating the river. He can direct as to the manner in which the boat shall be attached, and locate its position as it respects the steamboat wherever., he chooses. The captain and hands on board of the boat in tow are under the orders of the conductor of the steamboat in respect to steering and managing the "boat towed; and some one is to be constantly on deck subject to the orders of the conductor of the steamboat. Before taking the boat in tow, there is an opportunity of examining as to her seaworthiness and fitness for river navigation, to ascertain whether she is too heavily laden, or is in any condition so as *553 to endanger her passage on the river, and the toxv boat company can undoubtedly exercise their discretion in refusing to tow any canal boat, if from examination she should be found in such a condition as to be subject to more than ordinary risk or hazard. The practice of giving a permit by the agent of the company to tow the boat, as was done in this case, seems to imply that an examination had taken place, and that it was deemed safe to take the boat in tow.
It does not appear that, as respects the management of the cargo on board the boat towed, the conductor of the steamboat exercises any control; but if he has not confidence in the captain or hands of the boat towed, in regard to the steerage of the boat, or her management in any particular which concerns the safety of her passage on the river, he undoubtedly has the right to place a person of his own choice in charge of the helm.
It is difficult to perceive that the conductor of the steamboat does not possess the control of the boat towed, so far as respects her safe navigation, as fully as he would if she and her cargo were transferred to the deck of the steamboat, and the captain and hands were his passengers on board. It may be that in the latter case the conveyance of the boat and cargo might be attended with more safety; but that is a matter to be regulated by the parties in fixing the compensation.
The reasons for the rule which governs in the case of common carriers, arising from the safely and security which should attend the property of individuals when necessarily beyond their control, and from public policy, are applicable, it appears to me, to the case before us.
The next question is, have this tow boat company held themselves out to the public in such a light as will bring them within the definition of common carriers. “ To bring a person within the description of a common carrier, he must exercise it as a public employment; he must undertake to carry goods for persons generally; and he must hold himself out as ready to engage in the transportation of goods for hire, as a business, *554 and not as a casual occupation.” (Story On Bailm. § 495, 3d ed.)
It appears that the defendants have been engaged in the business of towing for a number of years. This employment is a public one, as much so as that of any other mode of transportation in this state. It is not a casual occupation, but one which has been regularly followed for a number of years, during the season of canal and river navigation. I can scarcely conceive of any persons who from their business would come more fully within the definition of common carriers than do these defendants. They hold themselves out to the public as ready to transport goods and other property on their own boats, and to tow canal boats at the same time, and by the same agency, from place to place, for all who choose to give them employment.
The law as to the liability of common carriers has been extended very far, and there may have been many cases of individual hardship, resulting from its application, where there was no actual default. But it appears to have been acquiesced in on grounds of public policy, and for the security of individual rights, during a great number of years; and the extent of our internal commerce seems rather to enhance than diminish the necessity of a strict adherence to its rules. The business of towing boats is already a large one, and will continue to increase with the augmentation of our population and the exten-" sion of our canals and rail-roads throughout the union.
It is a salutary rule which obliges a common carrier to take property for the purposes of transportation, when applied to and the usual compensation is tendered, or be liable for damages in consequence of a refusal.. There is great propriety in subjecting these tow boat companies to such a rule, who hold themselves out to* the public to do a general business of that character. The proprietors of canal boats navigating the Hudson river require such a rule in their favor, as much as the owners of any other species of property which is designed to be transported by the established lines for carrying merchandise or other property. It would subject the owners of canal boats to great incon *555 venience and delay if they could not depend upon having their boats towed on the river, by the established lines of towboats, with as much certainty as other property.
The defendants engaged to take the boat of the plaintiffs to Albany. This undertaking they have failed to perform. It does not appear that they were prevented from so doing by the happening of any of those events which will excuse them from liability as common carriers; and I can see no good reason why they should not be accountable for all the damages consequent upon their failure to fulfil the contract.
Had the boat Astorogan been towed to Albany in good order, and a loss or damage had happened to the cargo on board in no way consequent upon the improper or careless towing of the boat, the case might have presented a different question. It is easy to conceive of cases where a person would be held liable as a common carrier for a vehicle which he was transporting, and not liable for damage to the property it contained, Avhen that property has suffered damage from no act or neglect of the carrier, and Avhen the vehicle has been delivered according to contract. But in this case, the injury done to the boat was the cause of the damage and loss of her cargo.
I am clearly of opinion that public policy requires that those who undertake, as a general business, to tow canal boats upon our rivers and other navigable waters, should be subject to all the rules of law applicable to common carriers; and I can see no reasons why they should be exempt on account of the nature of their business, or their Avant of ability to protect themselves against loss or damage, as well in the towing of boats as in the carrying of goods on board their oavu boats or barges. I think, therefore, that the decision of the supreme court in this case should be reversed.
Porter, Senator.
Two questions are presented in this case for our consideration of very considerable interest, and they have been most elaborately discussed by the learned counsel of the respective parties. 1st. Were the defendants common carriers, and did they engage as such in towing the canal boat Astorogan *556 from New-York to Albany? 2d. If not common carriers, does the writing called a t: permit” furnish evidence of an agreement between the parties that the defendants should be exempt from 1 liability for all loss upon the voyage, except such as should arise from their fraudulent acts?
The business of towing boats by a motive power provided by other persons than those who own the boats, is becoming extensive; and the nature of the contract which they make who engage in towing, and the nature and extent of their responsibility in cases of loss or damage, are consequently interesting questions. When the owners of the steamboat New-London took property into the boat to be carried .to Albany, they became clearly, as to that property, common carriers, and answerable as such for any loss or damage to it. But their situation is very different in respect to property stowed away in a canal boat which they have undertaken to tow, and under the care of the master of that boat.
To constitute one a common carrier, he must assume the employment of carrying goods for hire, and make it his business. He then stands in a peculiar relation to the community, and becomes an insurer of the safe delivery of the goods committed to him to carry, answerable for accidents and thefts not only, but even losses by robbery. Indeed, he is answerable for all losses that do not fall within the excepted cases of loss by the act of God or by inevitable accident. (2 Kent's Com. 597.) But these liabilities attach only when the property is delivered into his possession and custody, and when he can, for the time being, have the exclusive control of it. For it would be absu rd to hold one absolutely accountable for the safe keeping and delivery of property, and especially as against thefts, the possession of which he could not control.
In this case, the defendants did not undertake to carry any particular goods or other property. The contract they made with the master was to tow the canal boat. The goods of the plaintiffs were'not in the defendants’ possession, nor under their control, in any sense. They had no right to enter the canal boat, much less to meddle with a single article on board. Nor had they a right to prevent other persons from entering, or *557 from taking away any of the goods. The master of the canal boat was in the possession, having the control of the goods as a common carrier, and as such he was answerable to the owners' for any accident or loss that should happen to them. And it was his duty to keep every person from entering the boat, except his necessary assistants. So far as it related to the navigation of the canal boat, while attached to the steamboat, the master was doubtless bound to obey the orders of the captain of the steamboat. But in all other respects, the control was exclusively in the master. He may very properly be considered as standing in the place of the owner of the goods, accompanying them, and retaining the possession and control of them ; and under such circumstances the carrier is not 1 iable for a loss. (East India Company v. Pullen, 1 Strange, 690.) In the case cited the servant of the owner accompanied the goods,' and Lord Raymond held, that there was no trust given to the carrier; that the goods were not to be considered as having been in his possession, but in that of the owner, and that the carrier for this reason was not liable for their loss; or in other words, that as it related to those goods, he was not to be treated as a common carrier. In Brinde v. Dale, (8 Carr. & Payne 207,) Lord Abinger held, that “if goods be delivered to A., under a contract that the owner shall go with them and take care of them, this is not a delivery to A. as a common carrier.” How does that case differ from the one before us ? Was it not a part of the contract that the master of the canal boat should go with it, and take care of the loading, as well as aid in the navigation?
The view taken by the counsel for the plaintiffs would require the defendants to insure the goods against any depredation which the master of the canal boat or his hands might commit, while the boat was passing from New-York to Albany. This would be too monstrous a proposition for any one to advocate, and yet I do not perceive why the argument does not necessarily lead to that conclusion.
Again, if the defendants were common carriers in this respect, they could not have received or rejected the master’s application to tow the canal boat at pleasure; nor could they have demanded *558 any particular price for their services. They would have been obliged to have taken the boat in tow, and have been content with a reasonable compensation for their services and the hazard they incurred: But this will hardly be pretended. The view I have taken of the question under consideration has been held by the circuit judge and the supreme court, whenever presented to them, and I think correctly. I can discover no ground for holding the defendants liable as common carriers.
But another question remains, and that is, what was the contract between the parties ? For although the defendants are not subject to all the liabilities that attach to common carriers, yet they may be liable to the loss in question, by reason of the contract they made. As bailees for hire, the defendants would be bound to exercise ordinary and reasonable care and skill in the navigation of the steamboat, and in towing the plaintiffs’ boat safely to Albany; and would have been entitled to a reasonable price for that service. This is not disputed; but the defendants allege that they made a special agreement, by virtue of which they are exempted from all claims for loss or damage, though they or their agents were guilty of the grossest negligence, provided it falls short of actual fraud. To maintain a proposition so extravagant as this would appear to be, the stipulations of the parties ought to be most clear and explicit, showing that they comprehended in their arrangement the case that actually occured.
As the judge withheld the testimony in this case from the consideration of the jury, we may assume, what I think the case shows, that the officers of the boat were guilty of gross negligence. Upon this assumption I will briefly examine the contract, to see whether it will bear the construction given to it by the defendants. The contract is as follows: “ Capt. Hitchcock, of steamboat New-London: Take in tow for Albany, canal boat Astorogan,-master, at the risk of the master and owners thereof and collect $30.” This was signed by the agent of the defendants, and is evidence that a contract was made between the parties in respect to the towing of the boat to Albany. But it is evident that much more was understood that entered into their *559 bargain, than was in fact expressed in the writing; and this court, in giving a construction to what is written, should interpret it in the same manner that the parties themselves would have done at the time it was made. In giving the meaning of the very brief language employed in the instrument, we should look at all the circumstances of the case, and the facts assumed, though not expressed, by both parties. It cannot admit of a question that the defendants understood it to be a part of the bargain on their side, that the steamboat was to be in good order, and capable of performing the trip to Albany, in a reasonable time; and that she was to be commanded and navigated by competent and skilful officers and engineers, who were well acquainted with the navigation of the river, and all its dangers, though nothing of this was expressed in the writing. Now suppose the master of the canal boat, on observing the language of the permit, “ at the risk of the master and owners,” had inquired of the defendants’ agent as to its meaning, and whether it was the understanding of the defendants that the plaintiffs were to assume the risk of the unfitness of the steamboat to perform the trip, or of the failure of the steam engine; or whether the incapacity or unfaithfulness or unskilfulness of the officers or engineer was to be at the risk of the plaintiffs. What would have been the answer of the agent? Would he have said: “It is all at your risk? If the boat founders or the engine fails, and the trip falls through, it is at your risk. Or if the captain, engineer or pilot, gets asleep or drunk, or proves to be entirely ignorant of the shoals or rocks in the bed of the river, in consequence of which the flotilla is run ashore, and your boat is bilged, it is at your risk. We shall expect to retain the $30, and that you bear all the loss. In short, we promise nothing on our part.” Such, I apprehend, would not have been his answer, but the very reverse of it. And yet such should have been the answer to the inquiry, if the construction which the supreme court have given to the contract is to be deemed the true one.
There are risks of navigation to which the terms of the bargain may be deemed to refer, much more consistent with fair dealing, and the probable intention of the parties, than to apply *560 them to the unfaithful acts of the servants of the defendants. Indeed, it may perhaps be well questioned whether the want of skill or care in the agents or servants of the defendants can properly be termed one of the risks of .the voyage. But however that may be, I have no hesitation in saying, that the contract will not, in my opinion, admit of a construction that shall protect the defendants from a loss arising from gross negligence. I understand the words “ at the risk of the master and owners,” to mean that the defendants will not insure against the ordinary hazards of river navigation, arid such as may occur when no charge of gross neglect of duty can be established against those who navigate the steamboat. And they probably were intended to protect the defendants from liability for losses in all cases, except those attributable to the bad conduct of the defendants’ agents.
I therefore think the circuit judge erred in nonsuiting the plaintiffs. He should have submitted the testimony to the jury, instructing them to inquire whether or not the loss had been occasioned by the gross negligence of the defendants’ agents.
In my opinion the judgment of the supreme court should be reversed.
Scott, Senator.
It is the duty of this court to preserve its ancient landmarks, and not encourage judicial legislation under the specious plea that necessity requires a relaxation of the “ rigid rules of the common law” in every new case.
A common carrier is one to whom goods or chattels are delivered to be carried, or to do something about them, for a reward to be paid by the person who delivers them. A delivery to one exercising a public employment, if he is to have a reward, renders him answerable at all events. (2 Ld. Raym. Rep. 913, 918.) This definition does not differ essentially from that of Mr. Justice Story. He says, a common carrier is “ one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place.” “ He must exercise it as a public employment; he must undertake to carry goods for persons generally; and he must hold himself out as ready *561 to engage in the transportation of goods for hire, as a business, not as a casual occupation pro hac vice.” (Story On Bailm. § 495.)
I think the defendants were common carriers. The canal boat, with the goods, were delivered to the defendants, to be carried to Albany for hire. The defendants were to do something about them for a reward, viz. to tow the boat to Albany. They exercised the trade and business of towing boats, and by this mode carried freight for persons generally. It was a public employment, not a casual one, they having continued it over eight years.
Owners and masters of steamboats, engaged in the transportation of goods generally for hire, are common carriers. (Story On Bailm. § 496, 3d ed.) It seems to be conceded by the court below, that if the canal boat, with the goods therein, had been placed on board the steamer, the defendants would have been common carriers for they say, the defendants “ do not receive the property into their custody.” (3 Hill, 19.) Is not a canal boat, made fast by the parties to a steam tow boat, under a contract to transport or tow for hire, delivered to the bailees, and in their custody, and as much under the control of the master of the steamboat, as if it had been hoisted on deck ? The hands on board of the boats towed are bound to obey the orders of the master of the steamboat. From necessity, the fleet of boats are under his command, because he controls the motive power. It appears absurd to say that the owners of a canal boat made fast to a steamer, are common carriers, when it has no power of moving from place to place, and must remain in a state of rest but for the steam power. They are carried, instead of being carriers in any sense of the word; and they contribute no more to their own motion or transportation than any package of goods on board the steamboat.
But where is the difference between a train of freight cars dragged on a railway by a locomotive, and a fleet of canal boats dragged by a steamboat? The cars and the boats are both moved by the same power, one on the land and the other on the water. And it is entirely immaterial, so far as the prin *562 ciple of liability is concerned, whether the carrier uses' human power, or horse or steam power, or atmospheric pressure.
I admit, when the common law rule was established, the wonderful power of steam, in its application to machinery and navigation, was not discovered. But the great revolution it has made in commerce is highly favorable to the common carrier, and where he makes use of it, whether on the water or on the land, his risks of transportation are very much diminished; and this is a reason why the great rule of public policy in relation to the liability of common carriers should be strictly adhered to.
The cases of Smith v. Pierce, (1 Louis. Rep. 359,) Adams v. The New-Orleans Steam Tow-Boat Co., (11 id. 46,) and Sproul v. Hemmingway, (14 Pick. Rep. 1,) decide that owners of steamboats, whose trade or general business is to convey, carry or tow vessels from place to place down the Mississippi, to its mouth, and to serve the public for hire, are common carriers. Those cases are founded in good sense, and are in strict analogy with the early decisions, when the carriage of goods was probably by drawing them on sledges or wheels upon land, or by boats on canals. Would the relationship or the responsibility of the common carrier be changed if a dozen wagons or boats were attached to each other ? Could it be pretended that the goods in either were not in his custody, because they were carried at the end of the train, and not on the horse’s back 1
The principle on which this case was decided by the court below seems to be this: The canal boat is drawn through the water by a steamer, and because it is not carried on deck, it is not in the custody of the owners of the steamer, and therefore they are hot common carriers. This distinction must have been adopted without reflection, and if recognized, will not only relax but abrogate the great rule of public policy applicable to carriers, which is in perfect keeping with the extension of our lake commerce.
The remaining question is, whether the notice, “ at the risk of the master and owners,” restricts the liability of the defendants. Whatever may be the conflict of opinion among judges in our sister states, I consider it settled here that a notice of this *563 kind, even when brought home to the owner or bailor, does not exempt the common carrier from liability. It has been held repeatedly, that common carriers cannot limit their responsibility as such, either by notice or by special contract. (The Camden & Amboy Rail-Road &c. v. Belknap, 21 Wend. 354; Clark v. Faxon, 21 id. 153; Hollister v. Nowlen, 19 id. 234; Cole v. Goodwin, id. 251; Pardee v. Drew, 25 id. 459; 5 Rawle, 179, 189; 1 Pick. 50; 2 Kent's Comm. 606, 7.)
The other points in this case it will be unnecessary to consider, if I am right in the view I have taken. I think the judgment of the court below should be reversed.
Sherman, Senator.
This was an action of trespass on the case, brought to recover the aihount of a loss sustained by the plaintiffs, as owners of the lake boat Astorogan, which was run upon a reef of rocks in the Hudson river, while being towed by the defendants, owners of a line of steamboats employed in the business of towing from New-York to Albany.
The principal question in the case is, whether the defendants are common carriers ; but before proceeding to examine it as fully as I propose to do, it may not be amiss to determine whether the circuit judge erred in excluding the advertisement offered in evidence by the plaintiffs on the trial. I think he did. The offer was to introduce the advertisement, and to follow it by proof that it was caused to be inserted in the newspaper by the defendants. The omission in the advertisement of the name of the steamboat New-London, seems to have been the principal ground for rejecting it. • This was wholly unimportant. It was offered, doubtless, for the sole purpose of showing in what capacity these defendants invited the public to patronize them ; how they held themselves out; and it would not have affected the admissibility of the advertisement had it appeared that the defendants employed or substituted other boats for all those named. The advertisement was an important piece of evidence. It was an invitation to the public to employ the defendants in the business of towing, inducing owners of canal and lake boats to send their craft beyond the termination of the canal, and to rely upon. *564 the defendants to tow them to and from the city of New-Yorb. In discussing the main question, therefore, I shall regard this rejected evidence as admitted.
Were the defendants common carriers ? The severe and rigorous nature of the law as to the responsibilities of common carriers, and the vast and rapidly increasing importance of this comparatively new branch of business in which the defendants are engaged, combine to enhance the magnitude of the question, and to call for a careful examination of it.
I propose to inquire of the best and most approved authorities, in the first place, what is a common carrier? “ A common carrier is a person who undertakes to transport from place to place, for hire, the goods of such persons as think fit to employ him. Such is a proprietor of stage-wagons, barges, lighters, merchant-ships, or other instruments for the public conveyance of goods.” (1 Smith’s Lead. Cas. 101, note to Coggs v. Bernard.) “ Any person undertaking to carry goods, either by land or by water, of all persons indifferently, is for this purpose a common carrier.” (2 Chitty's Bl. 451, note (22,) Am. ed. of 1830.) “A common carrier is one who undertakes for hire to transport the goods of such as choose to employ him, from place to place. Of this description are the proprietors of stage-wagons and coaches which carry goods for hire; lightermen, hoymen, barge-owners, ferrymen, canal-boatmen, owners and masters of ships, engaged generally in the transportation of goods for hire; and other persons, owning similar instruments of conveyance.” (Smith’s Merc. Law, 168.) “A common carrier is a person who undertakes to carry the goods of all persons indifferently for hire such as the mail-coach contractors, the proprietors of stagecoaches and wagons; the owners and masters of ships, and steamboats, engaged in the transportation of goods generally for hire; lightermen, hoymen, ferrymen, barge-owners and wharfingers.” (1 Leigh's N. P. 507.) It is the holding of themselves out “ as ready to engage in the transportation of goods for hire, as a business, and not as a mere occupation, pro hac vice,” which constitutes persons common carriers. (Beekman v. Shouse, 5 Rawle, 179, 188; Satterlee v. Groat, 1 Wend. Rep. *565 272; Spencer v. Dagget, 2 Verm. Rep. 92.) “All persons carrying goods for hire, as masters and owners of ships, lightermen, stage-coach-men, &c., come under the denomination of common carriers.” (Bac. Abr. tit. Carriers, (A).)
“The loccitio operis mercium vehendarum, is a contract relating to the carriage of goods for hireand this is by far the most important, extensive, and useful, of all the various contracts that belong to the head of bailment. The carrier for hire in a particular case, and not exercising the business of a common carrier, is only answerable for ordinary neglect, unless he by express contract assumes the risk of a common carrier.” (2 Kent's Com. 597,4th ed.) “ Common carriers undertake generally, and for all people indifferently, to convey goods, and deliver them at a place appointed, for hire, and with or without a special agreement as to price. They consist of two distinct classes of men, viz: inland carriers by land or water, and carriers by sea; and in the aggregate body are included the owners of stage-wagons and coaches, and rail-road cars, who carry goods as well as passengers-for hire, wagoners, teamsters, cartmen, porters, the masters and owners of ships, vessels, and all watercraft, including steam vessels and steam tow-boats, belonging to internal, as well as coasting and foreign navigation, lightermen, barge-owners, canal-boatmen, and ferrymen.” (Id. 598, 9.)
It is apparent that Chancellor Kent’s definition would include the defendants, without distinction as to the manner of towing- or transporting the goods or property; and he may be regarded as a direct authority for saying that the circumstance of a previous contract or stipulation as to the price being made, is totally immaterial. Indeed, it would hardly seem necessary to furnish an authority upon this point; for the whole mercantile community at the present day,' almost universally, make a special contract with the common carrier for the transportation of their goods, fixing a price, usually by the ton or by the hundred weight.
But it may be useful to pursue the examination of the authorities upon the subject of the peculiar qualities and nature of the employment that distinguishes the common carrier from other bailees.
*566 Mr: Story, in his excellent work on bailments, observes: “ To bring a person within the description of a common carrier, he must exercise it as a public employment; he must undertake to carry goods for persons generally; and he must hold himself out as ready to engage in the transportation of goods for hire, as a business, not as a casual occupation pro hac vice.' A common carrier has, therefore, been defined to be one, who undertakes for hire or reward to transport the goods of such as choose to employ him, from place to place.” (Story On Bailm. § 495, 3d ed.) In Coggs v. Bernard, (2 Ld. Raym. 918,) it was held that, “ if goods are delivered to a person in a public- employment, for a purpose in respect of which he is to have a reward, he is answerable for any loss or damage which is not occasioned by the act of God or the public enemy. And this is a politic establishment, contrived by the policy of the common law, for the safety of all persons the necessity of whose affairs oblige them to trust these sorts of persons, that they may be safe in their ways of dealing.” It was remarked by the court in the year 1785, in the case of Forward v. Pittard, (1 T. R. 33,) that “ it appears from all the cases, for 100 years back, that there are events for which the carrier is liable independent of his contract.” And “ the true ground of their liability is the public employment they exercise.” (See Bac. Abr. tit. Carriers, note; Coke Litt. 89, b. n. (6).) “ The great cause of the law’s charging the carrier is, the public employment he exercises.”
■ Here let me ask, what language can more forcibly or more clearly describe the character of the employment of these defendants ? What is the nature of their employment? Is it not public ? Is it not such as entitles them to a reward ? Did they not hold themselves out as ready to engage for any and ali persons indifferently? Did they not invite all persons, and were they not ready and willing to engage for all persons, who might desire their services ? Why then are they not common carriers ? What reason is assigned for exempting them from the liabilities incident to the nature and obligations of the common carrier ? Mr. Justice Bronson, in giving the opinion of the supreme court in this case, but on a previous motion, (3 Hill, 9, *567 19,) observes: “ I think they are not common carriers. They do not receive the property into their custody, nor do they exercise any control over it other than such as results from the towing of the boats in which it is laden.” With great deference to the opinion of the learned judge, it might be inquired, in what particular were the defendants deprived of the custody or control of the property or of the boat and its contents ? They had all the custody and control necessary to enable them to perform their contract, which was to transport, by means of towing, the Astorogan and its cargo from the city of New-York to the city of Albany. They had the absolute and unconditional possession of the cargo, and of the boat, for every purpose of navigation. The crew on board of the Astorogan were subject to the orders and direction of the captain of the New-London, so far as it was necessary in order to govern the flotilla.
It is said by the supreme court, moreover, that the defendants do not employ either “ the master or hands of the boats towed.” Certainly not; for the master and hands are passengers, to be carried with the boat and cargo, and are a part of the loading, if I may so term it, which the defendants contract to carry. They are attached to the boat, and must act in subordination to the master of the towing vessel, just so far as from the nature of this mode of transportation it may be required; and it would be just as much in violation of the contract to refuse to carry the master and crew, as it would be the boat. Suppose a ferryman, who receives a carriage and horses on board of his boat to ferry across the Hudson river, (instead of taking them lengthwise of it, as the defendants engaged to do,) should injure them by running on a rock. Could he set up Successfully, in defence of an action, that he had not the custody or control of the carriage, or urge that he did not employ the master or driver of the carriage ? Most certainly not. The master and driver are themselves to be carried, as well as the carriage itself. The ferryman rightly exercises any and all such authority over the carriage, the owner and driver, as may be necessary for him to perform his contract with perfect safety; and why should he have more than this ?
*568 The case of Caton v. Rumney, (13 Wend. 387,) is not in point, but is totally unlike this case. The business of the defendants in that case had none of the essential characteristics which distinguish the employment of a common carrier from that of a casual occupation pro hac vice. There was in that case no inviting of all persons indifferently to employ the defendants ; no willingness on their part to engage in towing for all persons that might desire their services; no advertisement that such was their public employment. Indeed, the facts of that case show a total absence of every circumstance which, since the earliest ages, have served to define the employment and distinguish the character of a common carrier.
In the case under consideration, the defendants were engaged in the public employment of towing canal boats for persons generally, and for all persons indifferently, to and from the cities of Albany and New-York, upon the Hudson river, for hire. They held themselves out as such, by advertisement in the public papers, qnd had continued in this public employment for some years. They had public offices established at New-York and Albany, and numerous steamboats constantly engaged in transporting boats, laden and unladen, upon the river. To exempt them from the same rigid accountability that is ever imposed upon all persons of precisely similar public employments, would render uncertain the rules of the common law, and ivork a serious wrong and injury to the business interests of the country. In the present case, it would have the effect of exonerating the defendants^ from all the essential obligations which, by the well established rules of the common law, entered into and formed a part of the contract made with the plaintiffs.
We heard much in the course of the argument of the severe and rigorous exactions of the law of common carriers, and it was urged that courts should, for this reason, be slow to. extend these rules to new cases. It may I think form a conclusive answer to this to reply, that the adoption of 'such a public employment as a means of livelihood is wholly voluntary; and when adopted, the strongest principles of public policy and of public expediency require the imposition of all the obliga *569 tions and responsibilities that have been recognized as incident to the nature of it. (1 Bell’s Comm. 466, 5th ed.; Gordon v. Hutchins, 1 Watts & Ser. 285, 288.) The exercise of such a public employment by any one is a tacit acknowledgment that he has agreed to perform all the duties and is willing to be subjected to all the accountability that belong to that character; and every person, therefore, when he engages in such an employment, and takes the delivery of property to be transported for hire, is aware that, by the known and uniform rules of the common law, he is responsible at all events for every injury arising in any other way than by the act of God or the public enemy. “ The extraordinary liabilities of a carrier were imposed upon him in consequence of the public nature of his employment, which rendered his good conduct a matter of importance to the whole community.” (17 Law Lib. 79, note.) As to the reasons for the rigor of the law in this respect, see 2 Kent’s Comm. 599; Jackson v. Rogers, (2 Show. Rep. 332;) Elsee v. Gatward, (5 T. Rep. 143;) Jeremy’s Law of Carr. 31 to 35; Story On Bailm. 321, 495, 496. The responsibility of persons exercising the public employment of carriers, was ruled by Sir Mathew Hale, in Morse v. Slue, (1 Ventr. 190, 238,) and afterwards by Holt and Mansfield. And Chancellor Kent says, these were the unanimous opinions of the king’s bench in favor “ of a great principle of public policy, which has proved to be of eminent value to the morals and to the commerce of the nation, in succeeding generations.” (2 Kent’s Comm. 602,)
The objection that this is a new case, was urged in Morse v. Slue, (1 Ventr. 190,) and in Pasley v. Freeman, (3 T. R. 63;) and it might have been urged in Coggs v. Bernard. In Pasley v. Freeman, Ashurst, justice, in answering the objection, says: “ Where cases are new in their principle, there I admit it is necessary to have recourse to legislative interposition, in order to remedy the grievance: but where the case is only new in the instance, and the only question is upon the application of a principle recognized in the law to such new case, it will be just as competent to courts of justice to apply the principle to any case which may arise two centuries *570 hence, as it was two centuries ago. If it were not, We ought to blot out of our law books one fourth part of the cases that are to be found in them.” Accordingly, if the present case was “ new in principle,” the appropriate remedy for obtaining redress would be a resort to legislative interposition. But this is only “new in the instance;” and to refuse the application of the principle would, in my judgment, be a reproach upon the administration of the law, and add judicial sanction to the already numerous, mysterious legal labyrinths, yclep’d “the glorious uncertainties of the law.”
The period is probably not far distant, if it has not already arrived, when the greater share of the inland carrying trade will be effected through the agency of steam upon our principal rivers: and it is not unlikely that the improvements in the application of steam power for towing purposes may induce its general use upon our canals. Why then should the whole community lose the benefit of the only reliable security against the injuries that may be committed by persons thus entrusted with property, by changing radically the degree of their accountability, and casting the whole burthen upon the distant owner to prove carelessness or want of skill before he can charge the carrier, instead of leaving the onus upon the latter to. excuse himself if he can. It is this rigid accountability that secures to the owner of the property prudence, care, caution and adequate skill in its transit. Remove that security, and you will have done a greater injury to commerce, to the people at large, and to the mercantile community, than could be done by totally annihilating the use of steam- power.
- There can be found no good reason for the existence of two entirely different and in all respects dissimilar grades of accountability in the transportation of property on the Hudson river by the same boat; the one the law of common carriers, controlling when the property is on board the steamboat, and the other the law of bailment for hire, when the property is towed alongside the steamboat by persons making this branch of business their public employment. It seems that carriers navigating the Mississippi are controlled by the same rules of law, whether the goods are on *571 board of their steamer, or towed alongside, provided they are in the process of being transported for hire; and the carrier is made subject to the same rigid responsibility in both instances, viz. that governing in cases of common carriers. The case of Adams v. The New-Orleans Steam Tow-Boat Co., (11 Louis. Rep. 46,) is directly in point. It was a case of towing, and is confirmatory of the decision previously made in Smith v. Pearce, (1 id. 46.)
. But even if the defendants were not liable as common carriers, and assuming that the permit contained the evidence of the contract between the parties, still this judgment ought to be reversed. A very forced construction was given to the language employed in the permit, and one which subjected the defendants to no sort of responsibility, at least none such as a sane man would entrust his property to another upon, to be shipped or transported from place to place. Conceding for the sake of the question that a bailee may go the whole length, and contract with the bailor for entire exemption from all responsibility, still in the absence of any agreement, the law will imply an obligation on the part of the bailee. If the bailee seek to exempt himself from such implied obligation, he will be required to make out, by the most unequivocal evidence, an express contract, exempting him in terms: it is not to be a matter of forced inference, nor a conjectural phantom.
The language of the permit is: “ Take in tow for Albany, canal boat Astorogan &c., at the risk of the master and owners thereof, and collect $30.” The learned judge who delivered the opinion of the supreme court, in giving his construction to the permit, (3 Hill, 20, 21,) says: “ In this case the defendants agreed to tow the boat at the risk of the master and owners thereof. These terms are broad enough to embrace any risk arising from want of ordinary care and skill, and I think we are not at liberty to construe them in a more limited sense.” If this be so, then the defendants did not undertake or agree to use even ordinary care or skill in towing the plaintiffs’ boat to Albany. They would have fulfilled their obligation by carelessly and unskilfully sinking the boat, running it ashore, blowing it *572 np by the bursting of their boiler, destroying it by fire, or suffering it to be injured in any other way, though that injury might be 'directly traceable to the want of ordinary care or skill on the part of the defendants or their servants. Suppose we incorporate into the contract of the defendants, in terms, the language which it is insisted expresses the legal interpretation of the permit. It would then read something like this: “ We [the defendants] agree, in consideration of $30, to us to be paid by the plaintiffs} to tow their canal boat Astorogan to Albany, and there deliver it to them, with the cargo, in good order, provided it can be done without exercising any ordinary care or skill on our part j and if in navigating the Hudson, the Astorogan and her cargo be lost or destroyed, by reason of our negligence or want of ordinary care or skill, it shall be deemed a literal performance of our contract, and entitle us to receive the reward of $30.”
If a contract of this nature, exempting the defendants from the exercise of ordinary care, would not be against the policy of the law, can it be seriously contended that the master of the canal boat made such a contract in terms ? Did he enter into an agreement to legalize the destruction of his employers’ property; to pay to another a premium of $30 for unskilfully and carelessly running the canal boat and cargo upon a reef of rocks;' guaranteeing immunity and protection against any liability for a loss which, if it had occurred under precisely the same circumstances, through the want of ordinary care and skill of the master himself, would have rendered him personally responsible to the owners'?
Again-, has the captain of a canal boat, acting as the agent of the owners, possessing all the power arising from the nature of his business, and none other, a right to make a binding contract with a third person, stipulating for entire protection against any right of action which the owners may bring for carelessly and unskilfully destroying their property ? It cannot be. Such an agency is clearly not incident to'the employment of the master of the canal boat •; and 1 hold that in order to bind the plaintiffs in this case by a contract virtually for the destruction of their property, made by the master of the canal boat, it should be shown that he had express, not implied authority, to make such a contract.
*573 The interpretation which it appears to me would be more in consonance with the evident intention of the parties, entirely consistent with the policy of the law, and agreeable to the fairest rules of construction, is this: The words “ at the risk of the master and owners,” should be deemed a notice by the defendants that they designed to restrict and modify the obligations implied by-law, arising from the nature of their employment, so far that they would undertake to tow the plaintiffs’ canal boat to Albany, and would exercise all ordinary care and skill to transport the same safely; but if upon the voyage, by reason of the dangers and perils of navigation, any damage or injury should arise, not occasioned by want of ordinary care and skill, it should be “ at the risk of the master and owners &c.”
It will be borne in mind that, in examining this part of the case, I have treated the defendants as bailees for hire; but I maintain they are common carriers. They sought an employment which is regarded as a public trust, and, by operation of law, are holden to such a measure.of accountability as is peculiarly appropriate to the highly important public duties which they professed themselves willing to discharge. In this character the burthen of proof to establish the defence would be cast upon them; and the effect of the permit, even if it is adjudged to be such a contract as is contended for by them, would not exempt them from liability.
There is still, another view of this case. The nonsuit was improperly granted, even if the defendants had been bailees for hire, and liable only for gross neglect, as was héld by the circuit judge. There was evidence of gross negligence. The .injury occurred upon a reef of rocks as well known to the sailor as was the shore of the river or the Catskill mountains. Although, had the case been put to the jury upon this question, and they had found the evidence insufficient, the court might not have interfered, still there was sufficient evidence to require it to be thus submitted. The question addressed itself to. the knowledge and practical experience of the jury as a matter of fact. If it could be decided by the judge that the evidence given, as matteroflaw, did not make out gross negligence, why would he not have been justi *574 fied in deciding the same way, had the evidence been that the boat was run ashore in the widest part of the channel of the river ?
But I think the evidence was sufficient to show gross negligence, and should have been held conclusive; at least in the absence of the evidence of the engineer and helmsman of the New-London, who upon no principle were the plaintiffs required to call. They were the agents of the defendants, who had been guilty of this gross negligence, if it existed at all; and the plaintiffs, after making out a prima facie case, could properly rest. And if the defendants omitted or refused to call such witnesses as would enable them to establish a meritorious defence, it should have been taken by the court and jury as a strong circumstance against them. They contracted to deliver the boat and cargo at Albany, which engagement remained unperformed, and relied upon the evidence to furnish an excuse for their nonperformance. How could this be a question of law for the court ? Was it not purely a question of fact for the jury whether the evidence was sufficient or not? The only service which the defendants have rendered the plaintiffs was that of effecting the total destruction of their, property, for which service it was adjudged they were entitled to retain, as their just reward, the $30 mentioned in the permit.
Upon all these grounds I am of the opinion that the judgment of the supreme court should be reversed.
On the question being put, “ Shall this judgment be reversed ?” . the members of the court voted as follows:
For reversal: Senators Backus, Bockee, Corning, Benniston, Johnson, Jones, Lawrence, Lott, Mitchell, Platt, Porter, Rhoades, Scott, Sherman, Smith, Varney and Wright—17.
For affirmance: Senator Varían.
Judgment reversed.(b)

 But see Story On Bailm. § 496, 3d ed.

 Upon the decision being announced, Senator Sherman offered a resolution, with a view as he said of ascertaining the ground of the judgment of the court, *575 declaring that the defendants were common carriers. This was opposed by the Chancellor, who was present at the decision, but had not heard the argument, and also by Senators Lott and Porter, and was finally withdrawn. Whereupon Senator Johnson offered another resolution, declaring that the defendants were to be deemed common carriers in respect to the navigation, which, after some conversation, was disposed of in a similar manner.